UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : CR. NO. 18-053 (KBJ) |
| | : |
| FERHAN PATEL, | : |
| | : |
| Defendant. | : |

## STATEMENT OF THE OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and defendant Ferhan Patel ("Ferhan"), with the concurrence of his attorney, agree and stipulate as follows that at times relevant to this matter:

### Background

1. A money transmitting business was one which transferred funds on behalf of the public by any and all means, including electronic transfers within the United States or to locations abroad.

2. Money transmitting businesses were required to be registered with the Financial Crimes Enforcement Network ("FinCEN").

3. Money transmitting businesses were required to be licensed in each state where the failure to do so is punishable as a misdemeanor or a felony under state law. The District of Columbia Money Transmitters Act required all money transmission businesses to obtain a license from the Superintendent of the Office of Banking and Financial Institutions of the District of Columbia. Pursuant to D.C. law, a violation of this statute was a felony punishable by a fine of not more than $25,000, imprisonment of not more than five years, or both.

1

4. The Bank Secrecy Act required money transmitting businesses to conduct due diligence of its customers, maintain corporate records, and implement anti-money laundering principles.

5. Pyramid schemes were scams in which the organizers promised the victims profits based primarily on recruiting others to join the scheme. Because little or no wealth was created, few or no products were sold, minimal or no investments were made, and few or no services were provided, the schemes eventually failed. Minimal or no product Multi-Level Marketing (a/k/a "MLM") scams and Money Cycler scams (a/k/a "Cyclers") were types of pyramid schemes.

6. A Ponzi scheme purported to be an investment opportunity, but payouts came almost exclusively from new investor money instead of the returns of the underlying investment, if any. Ponzi schemes inevitably collapsed as investors ran out of new victims to recruit and the underlying investment generated insufficient or no revenue to sustain the scheme. A High Yield Investment Program (a/k/a "HYIP") was a type of Ponzi scheme.

**AlertPay**

7. In or about 2004, Firoz Patel and Ferhan Patel founded AlertPay in Montreal, Canada. AlertPay acted as an online money transmitting business. That is, it was an online service that allowed persons and businesses to transfer funds electronically. AlertPay claimed to have been used by millions of members worldwide, including in the United States.

8. Many of the merchants that AlertPay accepted as customers did not go through a full compliance review, which meant that a full due diligence analysis could not be completed. In those instances, the compliance team would simply approve the Know Your Customer ("KYC") information.

9. During his tenure at AlertPay, Ferhan Patel knew that AlertPay was transmitting illegal proceeds based in part on statements made by co-conspirators, as well as his review of customer data.

10. During his tenure at AlertPay, Ferhan Patel became aware of this illegal money laundering and spoke with co-conspirators about it. Specifically, the co-conspirators and Ferhan Patel discussed that AlertPay was taking on MLMs, Cyclers, pyramid schemes, and Ponzi schemes as customers.

11. AlertPay used a software program, on at least one occasion, to conduct an automated compliance check of its customers. The software flagged many of AlertPay's merchants and found numerous compliance violations.

12. Co-conspirators would find merchants that were MLMs and other companies that would trigger compliance violations. These MLMs would be removed from reports of AlertPay's merchants. Ferhan Patel would send these sanitized reports to third parties who raised questions about AlertPay's customer base. Often AlertPay had to clean up its customer list because third parties were concerned that AlertPay took on high risk merchants.

13. AlertPay had Cyclers on their platform, which AlertPay staff understood to be another way of saying Ponzi schemes. Many of the Cyclers were MLMs selling technology products, but no actual physical products.

14. AlertPay employees would log into their personal AlertPay accounts and make financial transactions with high-risk merchants. Specifically, Ferhan Patel was participating as a customer in at least one of the Ponzi schemes for which AlertPay was providing money transfer services.

15. AlertPay had been processing transactions for a steroids distributor for several years. Ultimately, co-conspirator Firoz Patel was the subject of a money laundering indictment based on AlertPay's active facilitation of the illegal sale of steroids.

16. Ferhan Patel told a co-conspirator that he did not want to cut out high-risk merchant customers for fear that a competitor money transmitting business would get them.

17. AlertPay did not have a license to operate in any state in the United States or the District of Columbia. In spite of this lack of licensure, AlertPay offered its services in virtually every state in the United States and the District of Columbia.

18. Ferhan Patel was aware that AlertPay received a cease and desist letter from regulators in New Hampshire. Ferhan Patel was further aware that AlertPay continued to transact in New Hampshire in violation of this order.

19. AlertPay received letters from numerous state regulators inquiring about its unlicensed activities; however, Ferhan Patel allowed AlertPay to persist in operating in those states.

20. In 2011, AlertPay hired a U.S. compliance company ("U.S. Compliance Company 1") to conduct an audit of AlertPay as to compliance issues, which included licensing deficiencies.

21. U.S. Compliance Company 1 shared materials with AlertPay on the need to have licenses and how to get them. The consultants told Ferhan Patel that AlertPay was illegally operating without a license in at least 45 states and the District of Columbia.

22. In or about October 2011, the consultants warned that AlertPay must immediately shut down all U.S. operations, because they were violating U.S. law. On or about October 18, 2011, Ferhan Patel replied that their "game plan" was that they "cannot do a total shutdown of the US." On November 9, 2011, one of the consultants emailed Ferhan Patel, "[n]ot only can you not explain

why you are not in violation [of the licensing laws], you apparently think nothing of continuing the violation indefinitely."

23. AlertPay conducted hundreds of millions of dollars in unlicensed transactions.

### Transition from AlertPay to Payza

24. In early 2012, Firoz Patel purchased MH Pillars LTD. A co-conspirator discovered MH Pillars, a company in the United Kingdom that was already registered and established in another name, and purchased it. Ferhan Patel sought out a previously established company, so that it would appear that MH Pillars had a track record, as opposed to a brand new company that was only founded to serve as a front. Ferhan Patel was listed as the President of MH Pillars.

25. In early 2012, MH Pillars LTD, doing business as Payza, claimed to have purchased AlertPay. AlertPay accounts were transitioned to Payza accounts. The AlertPay website directed customers to Payza's website.

26. Firoz Patel and Ferhan Patel retained complete control of Payza. Ferhan Patel acted as the Executive Vice President of Marketing and in June of 2013, he became the Chief Compliance Officer of Payza, from which position he supervised a number of employees and divisions.

27. No substantive changes took place during the rebrand.

### Partnership with Obopay, Inc.

28. Obopay, Inc. ("Obopay") was an internet-based payment platform that specialized in mobile banking through the use of a cellular phone or other portable device. Obopay provided numerous financial services to its customers, including money transfer services, mobile and online commerce, bill payments, and disbursements. Obopay was registered with FinCEN as a money transmitting business. Although Obopay had also been licensed in numerous states, all of its licenses have lapsed over time; for instance, Obopay was licensed as a money transmitting business

in approximately 40 states at the end of 2012, which number went steadily down in 2013. Ultimately, Obopay surrendered its licenses in every remaining state in 2014 and subsequently ceased all operations.

29.     Pursuant to federal and state law, licensed money transmitting businesses may take on delegates that may operate under the umbrella of the parent's licensure.

30.     While AlertPay was transitioning to Payza, Payza began negotiations with Obopay to become a delegate. On March 28, 2012, Obopay entered into an agreement with MH Pillars Incorporated. The agreement appointed Payza as an authorized delegate of Obopay and in turn required Payza to provide Obopay with complete information necessary to perform the regulatory compliance services of a money transmitting business. The agreement also specified that Payza would comply with all legal requirements including, but not limited to, state money transmission laws and regulations relating to currency reporting and the prevention of money laundering, such as the Bank Secrecy Act. The agreement contained a list of the states where Obopay was licensed to operate.

31.     Prior to on or about March 28, 2012, when it entered into an agreement with Obopay, nearly all of AlertPay's/Payza's business in the United States was done in violation of U.S. law, because Payza had no state licensure at that time. Specifically, from January 1, 2012 through March 28, 2012, at least $10,000,000 was illegally transmitted via AlertPay/Payza.

32.     When state regulators would direct Payza to end all activity in their state, Payza would, at best, only turn off new signups, but still allow existing customers to continue transacting. Ferhan Patel was aware that Payza continued to transact funds for existing customers in unlicensed states.  By only shutting down new sign ups, Payza created the appearance that it was complying with the states' orders, when state regulators would attempt to sign up with undercover accounts

33. Ferhan Patel engaged in numerous discussions with co-conspirators regarding the states that Payza could not operate in; however, they disregarded this legal prohibition. Ferhan Patel permitted money transmissions to take place in all states, including after receiving cease and desist orders.

34. For example, California regulators sent Payza a cease and desist letter in September 2012, ordering Payza to cease all operations in California. On or about November 9, 2012, Ferhan Patel told a co-conspirator that Payza needed a way to spin its activities in California, but "don't admit we have been operating without a license…." Payza continued to operate in California.

35. Ferhan Patel directed a co-conspirator to sanitize a customer list being provided to Obopay, so as to remove known illegal merchants. This included Ferhan Patel directing the removal of merchants such as Ponzi scheme 1 and Ponzi scheme 2.

36. On or about March 13, 2013, a co-conspirator advised that Payza should not disclose to U.S. Bank 1 the states where Payza was operating without a license. The co-conspirator consulted with Ferhan Patel about a plan to falsely tell U.S. Bank 1 that Payza only operated in the states where Obopay was licensed.

37. From at least July 2011 to March 2013, Payza transmitted millions of dollars to the United States from Canada and conversely to Canada from the United States, including via U.S. Bank 1.

38. On or about May 10, 2013, Ferhan Patel received an email stating that Obopay had "officially asked that we cease activity in states where they are unlicensed." However, Payza continued such unlicensed activity.

39. On or about June 3, 2013, Obopay severed its partnership with Payza.

40. On or about July 10, 2013, Ferhan Patel became Chief Compliance Officer of Payza.

**Laundering of Funds by Payza**

41.     Ferhan Patel blocked subordinates from seeing accounts in Payza's online records/databases.

42.     Merchants were not removed from Payza's platform for being involved in high risk activities.  The criteria for customer removal was focused on whether the merchants posed a financial risk to Payza, *i.e.*, the merchant had a high chargeback rate from failed transactions for which Payza then had to compensate its customers.

43.     Payza had numerous merchants that were Cyclers, which Ferhan Patel knew to be Ponzi/pyramid schemes. In fact, a co-conspirator warned Ferhan Patel that "gifting" merchants were Ponzi schemes that Payza should not have on its platform.

44.     Ferhan Patel and other co-conspirators were sanitizing the list of customers to remove known money laundering merchants, before producing that information to third parties requesting customer information. For example, in a series of emails during May 2013, a co-conspirator informed Ferhan Patel that the co-conspirator was going through the customer list to get a cleaned up merchant list. In order to do this, he was looking for "any merchants who have gross violations such as adult, gambling, drugs, violence ect. [sic]. And what I think is the tricky part: Identify MLM's that are set up as obvious illegal Pyramid schemes."

45.     In February 2013, Ferhan Patel received an email with Payza's "Merchant Risk Guideline." A co-conspirator wrote comments in the document identifying all the internal compliance failures that did not match their high-risk guidelines manual.  This included specific failures in relation to preventing the taking on/servicing of pyramid and Ponzi schemes.

**Egopay – Money Transmitting Business Established by the Patels
to Launder Money**

46.     Payza struggled to maintain its relationship with financial institutions, which Payza needed to facilitate payment processing, because financial institutions believed that Payza had customers engaged in illegal activity.

47.     Firoz Patel had a new payment platform developed that would take on the merchants who fit the profile of HYIPs, Cyclers, and MLMs without products. Firoz Patel set a deadline for getting all of the high-risk income programs off of Payza's books and onto the new company's books. This new company would be called Egopay.

48.     Ferhan Patel gave a co-conspirator a Payza-branded prepaid card to pay for the registration of Egopay. In or about May 2012, the co-conspirator registered the company under the name of E-Commerce Worldwide in Belize.

49.     On or about June 3, 2012, Ferhan Patel asked a co-conspirator when the Egopay site would go live.

50.     On or about June 3, 2012, Ferhan Patel edited an email sent to direct high-risk Payza customers to migrate their accounts to Egopay.

51.     On or about January 1, 2013, Ferhan Patel sent a co-conspirator FinCEN registration information for Egopay.

52.     Once Egopay started taking on customers, the list of merchants Payza moved to Egopay was expanded to include additional high-risk customers.

53.     Any customer who was rejected by Payza's compliance and merchant risk team was sent to Egopay. For example, on or about September 26, 2012, a co-conspirator asked Ferhan Patel what to do with a list of cyclers and unlicensed foreign currency exchangers doing business on Payza. Ferhan Patel directed the co-conspirators to move these accounts to Egopay.

54. A co-conspirator operated Egopay in part from an office within Payza's offices.

55. After Liberty Reserve, a competitor money transmitting business, was shut down by U.S. law enforcement for money laundering, a co-conspirator told Ferhan Patel that, "Egopay will go through the roof soon." That is, the co-conspirators believed that many of Liberty Reserve's customers who were laundering funds would turn to Egopay as an alternative.

56. On or about March 27, 2013, Ferhan Patel further admitted in an email that Egopay was "classified as an msb [money service business] by new fincen regs this week…. They do no KYC [know your customer]."

57. On or about May 30, 2013, Ferhan Patel admitted in an email that "EgoPay is not licensed anywhere."

58. On or about August 23, 2013, Ferhan Patel discussed how to book Egopay revenue.

### Customers of Note

A. <u>Ponzi Scheme 1</u>

59. One example of a Ponzi scheme that operated using Payza was "Ponzi Scheme 1."

60. Payza's European payment processor questioned Payza about Ponzi Scheme 1. The payment processor became aware of Ponzi Scheme 1 because customers were complaining about the merchant.

61. Ponzi Scheme 1 was run by Person A.

62. On June 26, 2012, the payment processor again inquired as to whether Payza had removed Ponzi Scheme 1, as Ponzi Scheme 1 had been blacklisted by securities agencies as an illegal investment scheme.

63. Ferhan Patel failed to shut down Ponzi Scheme 1.

64. After Ponzi Scheme 1 was ultimately shut down by regulators, Ferhan Patel helped Person A open an account at Egopay for a spinoff of Ponzi Scheme 1. This new Egopay account allowed the illegal enterprise to continue operating. Ferhan Patel noted that Payza made approximately $58k in fees by moving Ponzi Scheme 1's account to Egopay.

65. Ferhan Patel was aware that Ponzi Scheme 1 was a Ponzi scheme. Ferhan Patel, knowingly allowed Ponzi Scheme 1 to transmit its illegal proceeds via Payza. Ponzi Scheme 1 used co-conspirator Payza to defraud its customers and promote its illegal activities by transmitting payments to and from victims of the scheme, and by allowing Person A to transmit funds for Person A's own enrichment. Ferhan Patel was aware that co-conspirators kept Ponzi Scheme 1 off Payza's customer lists.

B. Ponzi Scheme 2

66. Ponzi Scheme 2 is another example of the use of Payza to launder Ponzi scheme proceeds. Payza's primary transaction activity for the vast majority of 2012 related to Ponzi Scheme 2.

67. On or about August 3, 2012, Ferhan Patel discussed with a co-conspirator whether or not she had ever spoken to Ponzi Scheme 2's operator about moving his company offshore, to which the co-conspirator responded there had been a "very delicate conversation regarding this."

68. On or about August 17, 2012, the Securities and Exchange Commission ("SEC") filed a civil complaint in the United States District Court for the Western District of North Carolina against Ponzi Scheme 2 and Person B for the operation of an estimated $600,000,000 Ponzi and pyramid scheme. Ferhan Patel spoke to co-conspirators about this complaint.

69. AlertPay and Payza collectively processed over $250 million worth of transactions related to Ponzi Scheme 2 before it was shut down.

70. Payza employees were also customers of Ponzi Scheme 2. After a co-conspirator reported this to Ferhan Patel, the co-conspirator lost access to Ponzi Scheme 2's account data within the Payza platform.

71. The Payza customer support team spent most of their time dealing with Ponzi Scheme 2's customers. In fact, Ponzi Scheme 2's customer database at Payza was so large that it would crash their computer system if somebody tried to open the entire account at once. As such, a significant amount of Payza resources were devoted to Ponzi Scheme 2.

72. Approximately two months prior to Ponzi Scheme 2 being shut down, a meeting took place at Payza's offices regarding Ponzi Scheme 2. The meeting was attended by Ferhan Patel and other co-conspirators. During the meeting, they discussed that Person B had asked if changing his incorporation details would allow Person B to act as a merchant again. One of the Payza employees relayed that Person B had stated that Person B might be in trouble with the police and that the U.S. government was giving him trouble. Ferhan Patel and other co-conspirators failed to act on this warning and allowed Ponzi Scheme 2 to continue operating.

73. Prior to the SEC's action, Ferhan Patel was aware that Ponzi Scheme 2 was a Ponzi scheme. Ferhan Patel knowingly allowed Ponzi Scheme 2 to transmit its illegal proceeds via Payza. Ponzi Scheme 2 used Payza to defraud its customers and promote its illegal activities by transmitting payments to and from victims of the scheme, and by allowing Person B to transmit funds for Person B's own enrichment.

**Conclusion**

74. As part of this conspiracy, Ferhan Patel and others caused over $250,000,000 to be laundered and transmitted without a license. Additionally, these co-conspirators failed to conduct proper due diligence of their customers.

75. In or about June 2015, Ferhan Patel left Payza. He subsequently provided ad hoc consulting services to Payza.

76. All of Ferhan Patel's actions in furtherance of the offenses charged in this case, including the acts described above, were done willfully, knowingly, and with the specific intent to violate the law.

77. The foregoing statement of the offense is a summary of the principal facts that constitute the legal elements of the offenses charged in this case. This summary does not describe all of the evidence that the government would present at trial or all of the relevant conduct that would be used to determine the defendant's sentence under the Sentencing Guidelines and Policy Statements. Ferhan Patel acknowledges that the foregoing statement of the offense does not describe all of his conduct relating to the offense charged in this case.

        Respectfully submitted,

        _____
        ZIA FARUQUI
        Assistant United States Attorney
        555 4th Street, N.W., 5th Floor
        Washington, D.C.  20530
        (202) 252-7117 (Faruqui)
        Zia.Faruqui@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

The preceding statement is a summary, made for the purpose of providing the Court with a factual basis for my guilty plea to the charge against me. It does not include all of the facts known to me regarding this offense. I make this statement knowingly and voluntarily and because I am, in fact, guilty of the crime charged. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

I have read every word of this Statement of the Offense, or have had it read to me. Pursuant to Federal Rule of Criminal Procedure 11, after consulting with my attorney, I agree and stipulate to this Statement of the Offense, and declare under penalty of perjury that it is true and correct.

Date: __June 14, 2020__                         _____
                                                 Ferhan Patel
                                                 Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense, and have reviewed it with my client fully. I concur in my client's desire to adopt and stipulate to this Statement of the Offense as true and accurate.

Date: __June 15, 2020__                         _____
                                                 Jim Trusty
                                                 Jeff Ifrah
                                                 Attorney for Defendant Ferhan Patel