```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2      _____

 3      United States of America,     ) Criminal Action
                                      ) No. 1:18-cr-00053-KBJ
 4                     Plaintiff,     )
                                      )
 5      vs.                           ) Sentencing
                                      ) (via videoconference)
 6      MH Pillars Ltd., Firoz Patel, )
        and Ferhan Patel,             ) Washington, D.C.
 7                                    ) November 10, 2020
                       Defendants.    ) Time:  11:00 a.m.
 8      _____

 9      United States of America,     ) Criminal Action
                                      ) No. 1:20-cr-00113-KBJ
10                     Plaintiff,     )
                                      ) Sentencing
11      vs.                           ) (via videoconference)
                                      )
12      Firoz Patel,                  ) Washington, D.C.
                                      ) November 10, 2020
13                     Defendant.     ) Time:  11:00 a.m.
        _____

14
                     Transcript of Sentencing
15                     (via videoconference)
                           Held Before
16           The Honorable Ketanji Brown Jackson
                   United States District Judge
17      _____

18                 A P P E A R A N C E S

19      For the Plaintiff:       Arvind K. Lal
        (via videoconference)    U.S. ATTORNEY'S OFFICE FOR THE
20                               DISTRICT OF COLUMBIA
                                 555 Fourth Street, Northwest
21                               Fourth Floor
                                 Washington, D.C. 20530
22
        For the Defendants MH Pillars, Ltd. And Firoz Patel:
23      (via videoconference)    Danny C. Onorato
                                 SCHERTLER ONORATO MEAD & SEARS
24                               901 New York Ave, Northwest
                                 Suite 500 West
25                               Washington, D.C. 20001
```

```
1    For the Defendant Ferhan Patel:
     (via videoconference)    James M. Trusty
2                             A. Jeff Ifrah
                              IFRAH, PLLC
3                             1717 Pennsylvania Avenue, Northwest
                              Suite 650
4                             Washington, D.C. 20006

5    _____

     Stenographic Official Court Reporter:
6    (via videoconference)    Nancy J. Meyer
                              Registered Diplomate Reporter
7                             Certified Realtime Reporter
                              United States Courthouse, Room 6509
8                             333 Constitution Avenue, Northwest
                              Washington, D.C. 20001
9                             202-354-3118

10   _____
```

<u>P R O C E E D I N G S</u>

1

2          (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the
3    limitations of technology associated with the use of
technology, including but not limited to telephone and video
4    signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court
5    reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7          THE COURTROOM DEPUTY:  Your Honor, this is Criminal

8    Case 18-053, United States of America v. MH Pillars, Ltd.;

9    Firoz Patel, Defendant 2; Ferhan Patel, Defendant 3; and also

10   Criminal Case 20-113, United States of America v. Firoz Patel.

11         I'm going to ask counsel to please state their

12   appearance for the record, starting with the government and

13   then defense counsel.  And before they start, we have Sherry

14   Baker from the probation department.

15         THE COURT:  Thank you.

16         MR. LAL:  Good morning, Your Honor.  Arvind Lal for

17   the United States.  I'm joined by my colleague Steven Brantley.

18         THE COURT:  Good morning.

19         MR. ONORATO:  Good morning, Your Honor.  Danny

20   Onorato on behalf of MH Pillars and Firoz Patel, who is present

21   and on the phone.  With me in my office, just for the record,

22   are my colleagues Paola Pinto, one of our associates, and

23   Charlie Brogdon-Tent, our paralegal.

24         THE COURT:  Thank you.

25         MR. TRUSTY:  Good morning, Your Honor.  Jim Trusty on

1    behalf of Ferhan Patel.  Mr. Patel, with his wife,

2    Naureen Ahmed, is the box below me and present, and also

3    Jeff Ifrah from our law firm is on the line as well.

4          THE COURT:  Good morning to you.

5          Is that it for defendants and -- I'm just trying to make

6    sure I'm accounting for everyone.  And we have Mr. Firoz Patel

7    as well.  I see.

8          All right.  So we are here for the sentencing of three

9    co-defendants, Mr. Firoz Patel, Mr. Ferhan Patel, and the

10   corporate defendant, MH Pillars, who pled guilty on July 16th

11   of 2020 pursuant to the binding plea agreements that have been

12   entered in this case.

13         Mr. Firoz Patel pled guilty to one count of conspiracy

14   to commit an offense against the United States in violation of

15   Title 18 United States Code § 371 and one count of conspiracy

16   to launder monetary instruments in violation of Title 18

17   United States Code § 1956(h).

18         Mr. Ferhan Patel pled guilty to one count of conspiracy

19   to commit an offense against the United States in violation of

20   Title 18 United States Code § 371.

21         And the corporate defendant, MH Pillars, pled guilty to

22   that same offense.

23         Before we proceed, I want to acknowledge that we are

24   proceeding via videoconference technology because in light of

25   the COVID-19 pandemic, the courthouse has been operating in a

1    limited fashion.  We were closed between March and September,

2    doing things entirely virtually.  Now we have a standing order

3    from the Chief Judge that authorizes the court to use video

4    technology for certain felony proceedings with the consent of

5    the defendant and when further delay would cause serious harm

6    to the interests of justice.  We have an authorization from the

7    Chief Judge to continue in this vein for an additional 90 days

8    past September 23rd.

9         So let me start by asking the defendants if they consent

10   to proceed today by video teleconference.

11        Mr. Firoz Patel?

12             MR. FIROZ PATEL:  I do.  I do.

13             THE COURT:  All right.  Mr. Ferhan Patel?

14             MR. FERHAN PATEL:  Yes, Your Honor, I consent.

15             THE COURT:  And, Mr. Firoz, I understand you're

16   speaking on behalf of the corporation.  Does the corporation

17   consent as well?

18             MR. FIROZ PATEL:  Yes, it does.

19             THE COURT:  All right.  Mr. Firoz, you may need to

20   speak up just a little bit when you are talking so that we can

21   hear you for sure.

22             MR. FIROZ PATEL:  Yes.

23             THE COURT:  Thank you.

24             MR. FIROZ PATEL:  No problem.

25             THE COURT:  The Court finds that it is in the

1   interest of justice to proceed with today's sentencing hearing

2   via remote technology.  I also find that any further delay

3   would result in serious harm to the interests of the defendants

4   and the public.

5         As I mentioned, this is a joint sentencing hearing.

6   Each defendant pled guilty to a binding plea agreement that

7   laid out specific facts related to the defendants' conduct and

8   that also established a particular binding sentence -- sentence

9   or sentencing range that the parties agreed was appropriate for

10  the offense or offenses charged under the circumstances of this

11  case.  At the time of the plea hearing, the Court deferred

12  acceptance of the terms of the binding plea agreements in order

13  to permit me to review the presentence report for each

14  defendant, which I have now done.

15        I can say now that although I do want to hear and

16  consider what the parties say here this morning, based on the

17  submissions from the parties and the probation office, I am

18  inclined to accept the binding sentences or sentencing ranges

19  in the plea agreements, which means that all three of

20  defendants' guilty pleas will stand and all three defendants

21  will be sentenced here today.

22        It is a little tricky to address three defendants in the

23  same sentencing hearing.  So I propose that we proceed as

24  follows:  I will start by acknowledging for the record the

25  documents that I've received and explaining to all of the

1   defendants how the sentencing process will occur.  I'll then

2   conduct a sentencing hearing that addresses the guideline range

3   for each defendant separately and allow the parties to make

4   arguments regarding the appropriate sentence for each defendant

5   before I explain my considerations of the 3553 and the reason

6   that the Court will be imposing the sentence that it will

7   impose consistent with the 3553(a) factors.

8        I will also ultimately make an initial determination

9   about whether or not to accept the binding plea agreement, and

10  I'll do that officially before I state the sentence to be

11  imposed.

12       I do want to say to the defendants at the outset that

13  the law requires the Court and the parties to go through

14  certain steps in order to pronounce the sentence, and I do

15  realize that it is sometimes hard for nonlawyers to follow some

16  of the more mechanical parts of the sentencing hearing.  Your

17  lawyers are listening for the technicalities, and I'll be

18  asking them whether or not I have made accurate

19  representations.  As you listen, Messrs. Patel, you should keep

20  in mind the importance and the gravity of today's situation.

21       We are going through this process because you have

22  committed and pled guilty to serious conduct that constitutes a

23  federal crime.  Today's proceeding is significant and must be

24  taken seriously because it is fundamentally about the

25  consequences that you will have to face as a result of your

1  decision to engage in criminal behavior in violation of federal

2  law.

3          All right.  Let me begin.  First thing I'm going to

4  do -- give me one second.

5                 (Off the record.)

6          THE COURT:  Thank you.  We're still trying to get

7  used to our technology, and I was finding my background very

8  distracting.  So I'm here again.

9          All right.  So let me begin by acknowledging that I have

10  received and reviewed the following documents in advance of

11  this hearing:  the presentence reports and sentencing

12  recommendations from the probation office for all three of the

13  defendants and sentencing memoranda from the government and

14  from Mr. Firoz Patel and Mr. Ferhan Patel, including various

15  exhibits, letters.  In addition, you know, a letter that was --

16  literally arrived this morning.  So I have received those

17  materials.

18          It appears that the parties have engaged in the process

19  of reviewing and revising the presentence report and that the

20  final report is complete.

21          Mr. Firoz Patel and Mr. Ferhan Patel, with respect to

22  each of you and with respect to the corporate defendant as

23  well, these sentencing proceedings will essentially occur in

24  four steps.  The first step of the hearing is for the Court to

25  determine whether you have reviewed the presentence report and

1   whether there are any outstanding objections to the PSR and, if

2   so, to resolve those objections.

3       The second step is to determine what sentencing

4   guideline and sentencing range under the *Guidelines Manual*

5   applies to your case.  And the Court does this based on the

6   offense of conviction and any criminal history that a defendant

7   might have and its consideration of mitigating and aggravating

8   factors in the *Guidelines Manual* and also any consideration of

9   departures as necessary under the *Guidelines Manual*.

10      The third step is for me to hear from the government,

11  from your counsel, and from you, if you wish to be heard, about

12  the sentence in this case.

13      And the fourth step requires the Court to make a

14  determination about whether or not to accept the binding plea

15  agreements and, if so, to fashion a just and fair sentence

16  given the constraints of the plea agreement in light of the

17  factors set forth in a statute titled 18 U.S.C. § 3553(a).

18      It is my intention to undertake the first three steps

19  with respect to each of you separately and the corporation as

20  well before I move on to step four and discuss the -- the

21  section 3553(a) factors.  And if I do accept the binding plea

22  agreements, then as part of the last step of the sentencing

23  hearing, I will actually impose a sentence within the binding

24  range, along with other required consequences of the offense.

25      All right.  So let's begin.  I hope that was reasonably

1    clear.  I want to start by addressing Mr. Firoz Patel's

2    sentencing range.  The final presentence report and sentencing

3    recommendation with respect to your offenses, Mr. Firoz Patel,

4    was filed on November 3rd, 2020.  Let me start by asking

5    government counsel whether you have any objection to any of the

6    factual determinations that are laid out in Mr. Firoz Patel's

7    presentence report.

8              MR. LAL:  Your Honor, was that question directed to

9    the government?

10             THE COURT:  It was.

11             MR. LAL:  The government does not have any objections

12   to the factual statements in the presentence report,

13   Your Honor.

14             THE COURT:  All right.  Thank you.

15        Before I ask the same of defense counsel, Mr. Firoz

16   Patel, let me just start by asking you whether you are fully

17   satisfied with your attorney in this case.

18        I can't hear you, sir.  No.  You have no sound.  It must

19   be -- maybe it's the earphones.

20             MR. FIROZ PATEL:  Can you hear me?

21             THE COURT:  Yes, we do.

22             MR. FIROZ PATEL:  I'll get rid of the earphones here.

23   I'm sorry.  Just a moment.  I need to raise the volume.  Okay.

24   Yeah.

25             THE COURT:  It's good now.  Yes?

1          MR. FIROZ PATEL:  I couldn't hear you, though, so --

2     it's all right.  Anyway, so your question is whether I'm

3     satisfied with my attorney.  Yes, I am, indeed, Your Honor.

4          THE COURT:  And do you feel you've had enough time to

5     talk to him about the probation office's presentence report and

6     the papers filed by the government in connection with this

7     sentence?

8          MR. FIROZ PATEL:  I have.

9          THE COURT:  Okay.  Let me ask Mr. Onorato, have you

10    and your client read and discussed the presentence report?

11         MR. ONORATO:  We have, Your Honor.

12         THE COURT:  And do you have any disputes regarding

13    the facts?  This is separate and apart from the calculation,

14    but just the factual recitation in the presentence report, is

15    there any objection?

16         MR. ONORATO:  No objection to the facts as stated in

17    the PSR, yes, Your Honor.

18         THE COURT:  So hearing no objection, the Court will

19    accept the recitation in the presentence report regarding the

20    circumstances of the offense and Mr. Firoz Patel's history and

21    characteristics, and, therefore, the facts as stated in the

22    presentence report will be the Court's findings of fact for the

23    purpose of this sentencing.

24         The presentence report also lays out the probation

25    office's calculation of the advisory guideline range that

1    applies in this case.  That calculation was done using the

2    2018 *Guidelines Manual*, and it is quite complicated because of

3    the different guidelines that apply and the interactions

4    between them, both explicitly and based on the guideline

5    grouping rules.  So I'll try to -- it's laid out pretty -- I

6    guess as clearly as it can be in the PSR itself, but let me try

7    to summarize here.

8         According to the probation office, the applicable

9    guideline for Count 1, which is the offense of conspiracy to

10   commit crimes against the United States in violation of

11   18 U.S.C. § 371 is 2X1.1.  And the applicable guideline for

12   Count 4, which is the offense of conspiracy to launder money

13   instruments, in violation of various subsections of 18 U.S.C.

14   § 1956 is 2S1.1.

15        The Court agrees with and adopts the probation office's

16   guideline and grouping analysis which finds that the overt acts

17   underlying the conspiracy in Count 1 are operating an

18   unlicensed money transmission business in violation of

19   18 U.S.C. 1960(a) and laundering of money instruments in

20   violation of 18 U.S.C. 1956(a)(2)(A).  Each of those offenses

21   when you look in the *Guidelines Manual* is sentenced under

22   2S1.1.

23        The PSR also determined that the two underlying offenses

24   of Count 1 are grouped together under the guidelines pursuant

25   to section 3D1.2(d) and that Count 1's offenses are further

1    grouped with Count 4 under 3D1.2(b), which means that the group

2    guideline is the guideline that produces the highest offense

3    level for the covered counts.  Now, in this case, both Count 1

4    and Count 4 ultimately reference guideline 2S1.1.  So that is

5    the guideline that is applicable to the offenses of conviction

6    in this case.

7         So when we look at 2S1.1, the applicable base offense

8    level is determined pursuant to 2S1.1(a)(2).  I'm getting out

9    my trusty manual here.  That base -- that section, 2S1.1(a)(2),

10   provides that the base offense level is 8, plus the number of

11   offense levels from the table in 2B1.1 corresponding to the

12   value of the laundered funds.  So according to the PSR, based

13   on the facts that have been set forward and adopted by the

14   Court, 28 levels must be added because the offense involved a

15   value of more than $250 million but less than $550 million.

16   Therefore, the applicable base offense level in the PSR is 36.

17        The presentence report also indicates that three

18   specific offense characteristics from 2S1.1 apply:  a 6-level

19   increase under 2S1.1(b)(1)(A) and (B) for knowing or believing

20   that any of the laundered funds associated with Count 4 were

21   the proceeds of or were intended to promote the illegal

22   distribution of steroids.  There's also a 4-level increase

23   under 2S1.1(b)(2)(C) for being in the business of laundering

24   funds; that is, laundering funds for an extended period of time

25   and from multiple sources according to the PSR, and then a

1       12-level increase under 2S1.1(b)(3) because the offense

2       involved sophisticated laundering activities.

3              The PSR also includes a role adjustment under 3B1.1(a).

4       According to the probation office, Mr. Firoz Patel qualifies as

5       an organizer or leader of a criminal activity involving five or

6       more participants.  And, as a result, a 4-level enhancement is

7       warranted.

8              The government has also represented that Mr. Firoz Patel

9       has demonstrated acceptance of responsibility in a manner that

10      entitles him to a 2-level reduction under 3E1.1(a) and that he

11      timely notified the government of his intention to plead guilty

12      in a manner that entitles him to an additional 1-level

13      reduction under 3E1.1(b).

14             Therefore, according to the probation office, prior to

15      the consideration of any departures or variances, Mr. Firoz

16      Patel's total offense level, adding all of those specific

17      offense characteristics and role adjustments and subtracting

18      the acceptance points, the total is 49; but under 5A1.1 of the

19      *Guidelines Manual*, a total offense level greater than 43 must

20      be treated as a total offense level of 43.  Now, I see in the

21      plea agreement that the parties reached a different outcome in

22      terms of a guideline calculation.  The parties did not apply

23      the 6-level increase related to illegal drug distribution and

24      did not apply the 2-level offense characteristic for

25      sophisticated money laundering.

1    Let me ask whether the government or defense counsel

2    want to address the PSR's calculation in light of the disparity

3    between what you-all calculated and what appears in the PSR.

4        MR. LAL:  Your Honor, on behalf of the government, I

5    am initially mindful of the instruction that our office

6    received from our -- receives from our circuit every so often;

7    that if government counsel advocates for a position different

8    than one agreed to in the plea agreement, we can get in trouble

9    for that.  And so with -- unless the Court orders me as an

10   officer of the court to respond, I will kindly and respectfully

11   defer to the position taken in our plea agreement.

12       I will note for the record that I've worked with

13   Ms. Baker for a long time and she is an individual with

14   outstanding integrity and knowledge with respect to the

15   guidelines.

16       THE COURT:  All right.  And let me just -- I'm

17   looking at the plea agreement now to see.  The plea agreement

18   had a total of 44.  I won't go through this sort of -- figure

19   out how you got there, but the difference is 49 in the PSR and

20   44 in the plea agreement.

21       Mr. Onorato.

22       MR. ONORATO:  So, Your Honor, similar to -- to

23   Mr. Lal, you know, we did negotiate the resolution.  I'm pretty

24   confident that the guidelines, one of the reasons why they're

25   no longer mandatory are situations like this where you can

1       apply technical, you know, aspects to the guidelines that the

2       parties didn't contemplate in the bargaining.

3              I do, however, submit that I agree with Ms. Baker; that

4       there's probably a factual predicate for a number of increases

5       that she's seen.  I would respectfully submit to the Court that

6       it's probably academic because we arrived kind of at the same

7       place and we're dealing with statutory maximums in a (c) plea.

8       So that being said, I think that there are technical bases that

9       the Court may need to make findings that would support those

10      enhancements.  I don't want to argue that that evidence doesn't

11      exist.  Just note for the Court that -- the resolution that the

12      parties reached, you know, via the contract.

13             THE COURT:  All right.  I -- I think that makes

14      sense.  I agree with you that we're really kind of not so

15      concerned because the difference is not that great at the end

16      of the day given the operation of the *Guidelines Manual* that

17      would have the offense level at a minimum go to 43 but then be

18      capped, you know, for the purpose of -- of the statutory

19      maximum, in any event; but I will adopt the probation office's

20      calculation with respect to the raw number 49 given the fact

21      that the adopted facts in the PSR do appear to support the

22      increases that the probation office has observed.

23             So at least as a technical matter, what I will do is

24      adopt the 49, recognizing that that reduces to 43 by operation

25      of the guideline, and then we'll talk about where that leads us

1     in terms of the statutory maximum in a minute.

2          In terms of the criminal history category, the PSR has

3     found that Mr. Firoz Patel has zero prior convictions and that,

4     therefore, he is in Criminal History Category I.

5          Are there any objections to this criminal history

6     calculation?

7               MR. LAL:  Not on behalf of the government.

8               MR. ONORATO:  No, Your Honor.

9               THE COURT:  All right.  So given the criminal history

10    category of I and adjusted offense level of 43, you know, the

11    sentencing range in the table indicates, you know, life

12    imprisonment.  That's the sort of sentencing table analysis.

13         Now, there are maximum sentences in the relevant

14    statistics.  They're less than the minimum of the applicable

15    guidelines range.  So under 5G1.1(a) of the *Guidelines Manual*,

16    the guideline term of imprisonment becomes the statutory

17    maximum, which is 60 months as to Count 1 and 240 months as to

18    Count 4.  And, of course, as Mr. Onorato indicated, the parties

19    have negotiated a binding plea range that is below even these

20    guideline sentences.

21         So I'm just needing to make a record so that we all

22    understand what's happening, but are there any objections to at

23    least how the Court has analyzed this?

24               MR. LAL:  Not on behalf of the government,

25    Your Honor.

```
1              MR. ONORATO:  Not on behalf -- on behalf of

2     Mr. Patel, Your Honor.  Thank you.

3              THE COURT:  All right.  So the next step then is to

4     determine whether there are any departures.  I think as is

5     standard nowadays in this jurisdiction, none of the parties

6     have mentioned specific departure grounds, perhaps because of

7     the negotiated plea agreement, but I do give people the

8     opportunity to raise any departures if there are any to be

9     considered.

10             Mr. Lal.

11             MR. LAL:  Your Honor, I don't feel the need to

12    advocate for any departures.  I will just note for the record

13    that Ms. Baker, towards the end of her report, made a reference

14    to the Smith departure, and that's something that the Court may

15    want to take into consideration as it makes its final

16    determination.

17             THE COURT:  Can you point me directly to what it is

18    that you are referencing?

19             MR. LAL:  Certainly, Your Honor.  I'm focused on

20    page 31 of the final presentence report in paragraph 177c, as

21    in cat.

22             THE COURT:  Yes.  Now, I've not dealt with any such

23    departure before, so give me an idea of -- are you familiar

24    with the Smith case and what is it that --

25             MR. ONORATO:  So, Your Honor, I'm happy to address
```

1    that, if I can steal the floor from Mr. Lal.

2              THE COURT:  Sure.  Please.

3              MR. ONORATO:  So *Smith* stands for the proposition

4    that someone who comes here from another country that's not a

5    U.S. citizen will not be eligible for certain types of programs

6    when they're incarcerated in the BOP.

7              So, for instance, you can -- you tell clients when

8    they're facing prison sentences, let's say five years, that you

9    can generally get off about 85 percent -- 15 percent for good

10   time, and then there's going to be a period of halfway house

11   time when you're released from prison.  And that period of

12   halfway house can generally range from two to six months

13   depending upon, you know, the BOP and its determination.

14             Given the fact that obviously neither Mr. Patel are

15   U.S. citizens, there would be no halfway house placement

16   because they have no home to return to.  So they lose out on

17   home confinement opportunities and halfway house opportunities.

18   They also lose the ability to participate in certain types of

19   programs that would make them eligible for further reductions

20   of their sentence as deemed by the BOP.

21             And then the final aspect of *Smith* is that when both

22   Mr. Ferhan and Firoz Patel are serving their sentence in the

23   BOP, they will ultimately be transferred to ICE custody.  That

24   ICE custody transfer will result in an additional period of

25   incarceration beyond what Your Honor will contemplate because

1    they're not eligible to be released because they have no legal

2    status in the United States.  So they, therefore, would be

3    transferred to ICE.  And that can result in somewhere between

4    one, two, three, four more months of prison than Your Honor

5    would not contemplate at the time of the sentencing.

6           So courts routinely in this jurisdiction take that into

7    account.  Given the fact that we have a -- you know, obviously

8    a (c) plea, I make an argument to the Court, when I allocute as

9    to how that would fit into the sentence, but that is something

10   that the Court can -- can consider.  And generally the *Smith*

11   departure is modest.  It's a 2-level departure.  And so I would

12   ask the Court to consider that in totality with a 3553

13   situation.

14           THE COURT:  I see.  So you're not necessarily

15   pointing to something in the manual and -- and categorizing it

16   as a departure, but you're suggesting I can take it into

17   account in the context of the variance thought process with

18   respect to 3553(a)?

19           MR. ONORATO:  Yes, Your Honor.  It's -- it's -- it's

20   not, you know, a guidelines provision.  It's -- it's -- it's a

21   court -- it's a court case out of *Smith*, and *Smith* made that --

22   that -- you know, that law that judges have the discretion back

23   when the guidelines were mandatory to consider such

24   circumstances.

25           THE COURT:  All right.  Thank you.  That was helpful.

1      I appreciate it.

2                  MR. LAL:  Your Honor, may I interrupt?

3                  THE COURT:  Please.

4                  MR. LAL:  This is Mr. Lal.  The -- there's one aspect

5      of this that I would also -- one aspect of the plea agreement

6      that I'd like to just direct the Court's attention to.

7                  THE COURT:  Yes.

8                  MR. LAL:  And that is the government agreed in its --

9      in the agreement with both defendants, both individual

10     defendants, that we would not oppose a request by the

11     defendants for a transfer pursuant to treaties that exist

12     between the United States and Canada for them to serve their

13     sentences in Canada.

14          Now, the way that I understand that that process works

15     is once they actually report to the designated facility, they

16     can talk to their case manager.  They have to fill out a couple

17     of forms.  Those forms get forwarded to the Department of

18     Justice Office of International Affairs.  That office has, I

19     think, 90 days, sort of administratively, to make a decision.

20     And if assuming they approve that request, that request gets

21     communicated to Canada, and then it's frankly up to Canada -- I

22     mean, Canada has its own bureaucratic process in terms of

23     accepting somebody, and that, unfortunately, can sometimes take

24     six months to a year.

25                 THE COURT:  All right.  So I take it that you're

1   suggesting that that would then nullify the concerns that

2   Mr. Onorato points out with respect to service of their

3   sentence in the context of the United States criminal justice

4   system?

5          MR. LAL:  Possibly, assuming that they get to the

6   Canadian bureau -- their Canadian Bureau of Prisons facility in

7   sufficient time.  Assuming that the -- depending on the

8   sentences that the Court were to ultimately decide on and the

9   amount of time that it takes for all that to happen, it could

10  become an issue; it could not become an issue.  And I'm sorry

11  to be so -- not so direct about this, but the information I've

12  received is that it's sort of a -- a process -- it's a process

13  as opposed to things are going to happen at certain times.

14         THE COURT:  So there's a possibility that they --

15  that they wouldn't be transferred to Canada if -- if their

16  sentences were -- were too short to allow for that process to

17  occur; is that what you're --

18         MR. LAL:  Yes, Your Honor.  Yes.

19         THE COURT:  All right.  Understood and helpful.  So

20  thank you, both.

21         MR. ONORATO:  Your Honor, if I may just briefly.

22         THE COURT:  Yes.

23         MR. ONORATO:  So there's no guarantee one way or the

24  other, even if the sentence were longer, that the treaty

25  would -- I mean, the treaty technically allows for it.  There

1    are a variety of factors that go into it.  The DOJ has agreed

2    to -- to obviously not oppose it, but Canada doesn't have to

3    accept it.  And so that's the -- there's, like, an unknown

4    quantity to it, just to point out for the Court.

5             THE COURT:  Understood.  But also, for the record,

6    we'll note that the defendants are currently residing in Canada

7    pursuant to all of our hard work at the beginning of this case

8    to make sure that they could be at home while it was being

9    prosecuted, so...

10            All right.  Thank you.  That was helpful.  What I will

11   do is not then consider this in the -- in the context of

12   departures and will continue any concerns or consideration of

13   that to the portion of the sentencing hearing in which I'm

14   thinking about and discussing 3553(a).

15            Is there any other departure basis that we need to be

16   focused on right now?

17            MR. ONORATO:  No, Your Honor.  I -- I addressed

18   everything with respect to a variance under 3553 --

19            THE COURT:  All right.

20            MR. ONORATO:  -- within -- within the confines of the

21   range.

22            THE COURT:  Yes.  All right.  Well, it is my ordinary

23   practice to lay out at this point what the applicable statutory

24   and guideline penalties are for an offense, and I do

25   understand, as we've been saying here repeatedly, that we are

1    talking about a binding sentencing range that has been

2    negotiated, but I want to just lay out the parameters of the

3    law as a precursor to the Court's explanation and consideration

4    of whether or not to accept the binding plea range.

5         So Count 1 in this case, the charge of conspiracy to

6    commit crimes against the United States in violation of

7    18 U.S.C. § 371 carries a statutory maximum penalty of five

8    years of imprisonment.  Because of the charges in this case as

9    stated in the superseding information, no mandatory minimum is

10   applicable.

11        For Count 4, the charge of conspiracy to launder money

12   instruments in violation of 18 U.S.C. 1956(h), there is a

13   statutory maximum penalty of 20 years of imprisonment.  Because

14   of the charges as stated in this case, there is no mandatory

15   minimum for that count either.

16        Under the applicable statutory provisions,

17   Mr. Firoz Patel is eligible for not less than nor more than

18   five years of probation.  He is not eligible for probation

19   under the guidelines, however, and the parties' binding plea

20   agreement does contemplate a period of incarceration within the

21   range set forth in that agreement.

22        If a term of imprisonment is imposed, the statute

23   provides that Mr. Firoz Patel faces a supervised release range

24   following imprisonment of no more than three years on both of

25   the counts, on either count, while the guidelines provide for a

1    one- to three-year range of supervised release.

2          The statute of conviction sets a maximum fine of up to

3    $250,000 for Count 1 and $500,000, or twice the value of the

4    monetary instrument or funds involved, for the offense for

5    Count 4.  While the guideline fine range is -- for both counts

6    is between 50,000 and 500,000, and, of course, that could run

7    or be imposed concurrently.

8          As for the statutory and guideline restitution

9    provisions, the PSR maintains that the restitution is

10   impracticable in this case given the large number of

11   identifiable victims and the need to determine complex issues

12   of fact related to the cause and amount of the victims' losses,

13   but there is a consent order of forfeiture that pertains to the

14   amounts that the government has already seized.  I would like

15   to discuss forfeiture in particular, in a moment, as I

16   indicated in the PSR notice that I sent to you-all yesterday.

17         But, first, let me just ask as a general matter whether

18   I have stated accurately the statutory and guideline framework

19   under which we are operating in this case.

20         MR. LAL:  On behalf of the government, yes, you have,

21   Your Honor.

22         MR. ONORATO:  Yes, Your Honor.

23         THE COURT:  All right.  So let me turn your attention

24   to forfeiture.  Give me one second.  I notified the parties

25   about my concern about the forfeiture money judgment

1    provisions.

2         So, Mr. Lal, maybe I can have you clarify what is going

3    on, and in particular, just so the record is clear, I am not

4    understanding the need for a money judgment under these

5    circumstances.  My understanding was that the government had

6    located, seized, recovered, identified actual sums of money

7    that are associated with the offense conduct in this case, and,

8    if so, what -- what's going on with the money judgment?

9         MR. LAL:  Your Honor, as a practical matter, when the

10   government seizes specific property, whether it's money or, you

11   know, cars, boats, airplanes, whatever it might be, there is a

12   possibility, because the government is required to give notice

13   to the world and to anyone that might have an interest in that

14   property, to allow them to file a claim with respect to that

15   property.  So if somebody were to come along and file a claim

16   and Your Honor were to determine in the ancillary proceeding

17   that would be conducted pursuant to Rule 32.2 that, in fact,

18   that person who filed the claim, the claimant, had better title

19   to that particular piece of specific property, then that

20   title -- or that property would be given to them and the

21   defendants would still owe whatever forfeiture money judgment

22   the Court had ordered.

23        One of the things that's going to happen in this case

24   and that I think makes this different from the Court's opinion

25   in *Young* is that there is no opportunity for double counting

1    here.  The government has a provision in the final consent

2    order of forfeiture that was forwarded to the Court that

3    includes a provision that says upon final forfeiture of the

4    money that -- upon final forfeiture of the seized money to the

5    United States, that money will be credited to the forfeiture

6    money judgment of the defendant.

7         So there is no opportunity or possibility here of any

8    double counting, which was -- I -- I won't say it was the only

9    concern, but it was the primary concern that I believe the

10   Court raised in *Young*.

11        THE COURT:  All right.  So your -- so it is the -- it

12   is the government's concern that there may be ancillary

13   litigation and claims to the pot of money that the government

14   either has or has identified, and, as a result, it's important

15   to make sure that the defendant still forfeits the amount?

16        MR. LAL:  Correct.  That's -- that's -- yes.

17        THE COURT:  All right.  Let me ask Mr. Onorato

18   whether he's comfortable with the way in which the government

19   has structured this.

20        MR. ONORATO:  So, Your Honor, I don't obviously want

21   to violate a plea agreement that we negotiated with the

22   government and that we -- you know, through -- through, I

23   think, a lengthy plea negotiation to deal with these issues and

24   to deal with the specific credits.  I will say to the Court

25   that the government did craft the language in a manner

1    consistent with mitigating the potential harm to both

2    Mr. Patel -- both Mr. Patels, as well as MH Pillars, by giving

3    that, you know, monetary judgment credit so that there will not

4    be a double counting.

5        I think Mr. Lal has represented to me as of today's

6    date, no one has made a claim before Your Honor for these types

7    of funds, and so right now there is no exposure.  That doesn't

8    mean it could not change, and that's something that we're

9    cognizant of, but I think that the equities that we discussed

10   with myself, Mr. Faruqui, and Mr. Lal, understanding

11   Your Honor's opinion in *Young*, I -- I do agree with Mr. Lal

12   that this was an attempt to work around any concerns that

13   Your Honor had in *Young*.

14        THE COURT:  All right.  Well, I trust that the

15   parties have looked at this.  They understand the concern at

16   least that I expressed in what sounds like a somewhat different

17   set of circumstances in my -- in my opinion, and I just wanted

18   to sort of raise that.

19        So I'm not opposed to what you have put forward,

20   Mr. Lal, with the exception of it needing to be updated.

21   The -- the actual documents that you have provided as the final

22   consent order, I believe, still lists former Assistant

23   United States Attorney Zia Faruqui as the recipient of the

24   certified copy of the payment at the very end of each one.  So

25   we'll need to get that changed in order to -- to make this an

1    accurate document, I think.

2         MR. LAL:  I will certainly do that, Your Honor.  My

3    apologies for missing that.  The only other thing that I failed

4    to point out from a legal perspective is that because -- unlike

5    the *Young* case, which was controlled by Title 21, section 853,

6    the forfeiture in this case is controlled by 18 U.S.C.

7    982(a)(1) which allows for forfeiture of all involved-in

8    property, and that's the legal basis for the forfeiture.  But I

9    will make that change, and I will --

10        I'm waiting for one more set of documents that are

11   signed by the parties, and as soon as I get that, I will submit

12   that to the Court, but I believe both Mr. Trusty and

13   Mr. Onorato can represent to the Court that, in fact, they are

14   in agreement with -- that they're -- Mr. Trusty and his client

15   have signed their document and Mr. Onorato and his client are

16   about to sign their documents.

17        THE COURT:  All right.  We'll have them make that

18   representation in the context of their discussion of what the

19   appropriate sentence will be.  Let me just double-check with

20   you, Mr. Lal, that the amount -- first of all, is the amount

21   the same for both Mr. Ferhan Patel and Mr. Firoz Patel?

22        MR. LAL:  They are not the same, Your Honor.  There

23   was a -- I believe the number is 270 -- I'm just trying to find

24   -- yeah, $270,000 seizure that was made, I believe, subsequent

25   to Mr. Ferhan Patel leaving -- leaving Payza, and, so,

1    therefore, that's the difference in the two amounts.

2    Mr. Firoz Patel has a total forfeiture amount of $4,620,100,

3    and Defendant Ferhan Patel has a criminal forfeiture money

4    judgment of $4,350,100.

5            THE COURT:  One hundred dollars.  So I think I need

6    to get -- I think I need to get these exact amounts.  I have

7    $4,350,459.45 for Ferhan Patel, which may have been adjusted.

8            Sorry, Mr. Lal, you're on mute.

9            MR. LAL:  I'm sorry, Your Honor.  I was just reading

10   from my sentencing memo, and that was incorrect.  The -- you're

11   correct.  The correct numbers are -- I'm sorry.  Too many piles

12   of paper here.  The correct number for -- as reflected in the

13   final consent order of forfeiture, the correct number for

14   Mr. Firoz Patel is $4,620,459.45.  That includes that $270,000

15   I mentioned a moment ago.

16           THE COURT:  All right.

17           MR. LAL:  With respect to Mr. Ferhan Patel, the total

18   number is $4,350,459.45.

19           THE COURT:  459.45.  Yes.  Okay.  All right.  I think

20   we can keep this straight.  As you said, a lot of, sort of,

21   moving parts here, but let me ask defense counsel for both

22   defendants, now that I have our attention on forfeiture,

23   whether they are agreeing that the numbers in the final consent

24   order of forfeiture are accurate.

25           MR. ONORATO:  Yes, Your Honor.

1         MR. TRUSTY:  Yes, Your Honor.

2         THE COURT:  Okay.  I will keep that in mind moving

3  forward, and I accept the parties' representations concerning

4  the nature of the forfeiture insofar as they're seeking -- the

5  government is seeking a money judgment.

6         All right.  Let me turn to you and ask -- we're at the

7  stage now where I give the parties the opportunity to address

8  the sentencing guideline calculation and the Court's

9  considerations under 3553(a).  So focusing now on -- on

10  Mr. Firoz Patel, let me ask Mr. Lal whether you have any

11  interest in speaking to the government's position as to what

12  the appropriate sentence should be in his case.

13         MR. LAL:  Yes, Your Honor.  As articulated in the --

14  the government's sentencing memoranda, the government believes

15  that Mr. Firoz Patel should be sentenced to -- at the top of

16  the agreed-upon range or 52 months.  We would request the full

17  three years of supervised release, the special assessment

18  required by -- of $200 that's required, and a forfeiture money

19  judgment in the amount that we just mentioned and the specific

20  forfeiture of the assets listed in the consent order of

21  forfeiture.  If the Court would like me to specify them, I

22  will, but I'm not sure I need to here.

23         THE COURT:  That's all right.  We don't need to, but

24  do you -- to the extent you feel comfortable, speak to the term

25  of imprisonment that the government is requesting.

1          MR. LAL:  Certainly.

2          Your Honor, this -- Mr. -- both Patel brothers founded

3     AlertPay back in 2004, and from the beginning, they were

4     transmitting the proceeds of illegal schemes, whether they be

5     pyramid schemes or other fraud schemes.  One of the schemes

6     that they were processing money for was the -- the business of

7     steroid distributor.  And it was in that -- for that particular

8     course of conduct that Mr. Firoz Patel was charged in

9     Tennessee.  That is the Count 4 of the money laundering count

10    that was referred to our jurisdiction and for which he has pled

11    guilty.

12          Throughout the course of whether it was AlertPay or

13    Payza or EgoPay, Mr. Firoz Patel was, in fact, the leader of

14    the money service businesses, whichever name they took at any

15    particular time.  And it was -- you know, as one sort of money

16    service business got into trouble, they would create a second

17    one and then the third one.  They had that whole relationship

18    with Obopay, and they continued to conduct business in states

19    in which they were not licensed.  And Mr. Firoz Patel

20    ultimately ended up firing -- or excuse me -- Obopay ended up

21    terminating that particular relationship.

22          Between the two of them, it's the government's position

23    that Mr. Firoz Patel was the bigger player.  And it's -- I --

24    to the extent that the Court has an obligation and the

25    government has a concomitant obligation to make sure there's

1    not a disparity in the sentences that are issued to defendants,

2    we believe -- and I'm sort of working backwards here -- that

3    Mr. Ferhan Patel based upon his conduct deserves a sentence of

4    24 months.  And given Mr. Firoz Patel's bigger role in the

5    money service businesses, as well as his guilty plea with

6    respect to the steroid distribution from the Tennessee case,

7    that's what supports a sentence at the upper end of the

8    agreed-upon range or 52 months.

9           THE COURT:  All right.  What about the government's

10   view of the supervised release range?  Why so long for that?

11          MR. LAL:  Your Honor, for both defendants it's the

12   government's position that their scheme ran for quite a long

13   time.  As I mentioned, AlertPay was first formed in 2004.

14   Their activity in terms of processing money for other

15   fraudsters did not come to a halt until the government started

16   seizing money that they had at various locations.

17          And because they were at it for so long, it's the

18   government's position that the full three years authorized by

19   the guidelines is, in fact, the appropriate length of

20   supervised release for both defendants.

21          THE COURT:  All right.  Anything else, Mr. Lal?

22          MR. LAL:  No.  Thank you, Your Honor.

23          THE COURT:  Mr. Onorato.

24          MR. ONORATO:  Thank you, Your Honor.  Just looking at

25   the time, I'm in between -- it's either morning or afternoon,

1    depending on what clock.  So I'll say good afternoon to

2    Your Honor.

3         Obviously we're here for the sentencing of Firoz Patel,

4    and I know that the Court has read our submission, and I'll try

5    to be brief in my -- in my remarks this morning, but if you'll

6    bear with me for a few moments, Your Honor, I'd like to

7    illustrate why I think that a sentence of 20 months is

8    appropriate and warranted under the unique circumstances

9    presented in this case.

10        Your Honor, as the Court is aware, we've argued

11   vigorously that a sentence imposed of 20 months is sufficient

12   but, quote, not greater than necessary to fit the mandates of

13   18 U.S.C. 25- -- 3553, and I know the Court has carefully

14   reviewed all of the material.

15        But I'd like give you a better sense of the person that

16   you're about to sentence, and, you know, frankly, Your Honor,

17   when we talk about these guidelines and the numbers and 35 or

18   40 or 53 or life imprisoned, that ignores the most critical

19   factor that's before the Court, and that's what I want to focus

20   to -- to -- Your Honor on, and that is kind of the nature and

21   circumstance of the offense and the history and characteristics

22   of the person you're about to sentence.

23        Your Honor, in my nearly 23 years of practice,

24   sentencings like this have always been the most difficult part

25   of my job.  I think that Mr. Trusty, who, you know, like me was

1    a prosecutor and a defense lawyer, and Mr. Lal, who -- who I

2    started in the office at the same time with, can probably agree

3    with me on this point.  They were hard for me when I was a

4    prosecutor for the reasons I just stated.  You were required to

5    calculate guidelines and to come up with a numeric figure and

6    kind of ignore important things that you should consider when

7    you're dealing with an individual.  This is not a mathematical

8    equation based upon a book that should be blindly followed, and

9    I appreciate that Mr. Lal and his predecessor, Mr. Faruqui,

10   didn't treat it as such.  They -- they recognize the way that

11   these charges were -- were overstated in terms of the potential

12   jail time.

13        But I do think saying that the upper end of the

14   guideline range is oversimplified, and I think when you

15   consider the mitigating factors that are present, a 20-month

16   sentence is appropriate.

17        And, Judge, as difficult as these sentencings were for

18   me both -- as a prosecutor, they're ten times more difficult as

19   a defense lawyer.  Because, on a personal level, I have an

20   obligation to get you to understand why I want the Court to

21   understand why a sentence of 20 months is appropriate, and I

22   know that the Court is very thoughtful and probably has

23   consternation when it imposes a sentence.

24        So, Your Honor, with all of that, I would like you to

25   understand that I've had an opportunity to get to know

1     Mr. Patel over the course of the last two and a half years of

2     my representation.  And I think that I'm in a unique position

3     to get you to understand his mind-set not only today but back

4     when he was committing offenses, to put it into context.  So if

5     you'll let me share some of my observations, I think that would

6     be useful for the Court when you analyze his history and

7     characteristics and craft a sentence that is sufficient but not

8     greater than necessary.

9          First and foremost, Your Honor, when I was talking to

10    Mr. Patel, he has always instructed me to a find way to resolve

11    the case.  And so from the beginning, I reached out to,

12    obviously, Mr. Faruqui, who was my AUSA person, but Mr. Lal as

13    well, and tried to resolve the case in a way that was favorable

14    to Mr. Patel, realizing the kind of draconian sentencing

15    guidelines that we were facing; and that was one of the things

16    that took a long time to negotiate with the government.  But

17    it's clear to me that when I started to talk to Mr. Patel, that

18    he wanted to accept responsibility for what he's done and he

19    knew that he was wrong.

20         Second -- and it's something that the government, I

21    don't think, can appreciate when it makes an allocution in a

22    case like this, is that you have to look at the individual

23    who's charged with a crime, who's under the microscope and

24    scrutiny of the government and what the collateral consequences

25    of that can be to a human being.  And what I would submit to

1    the Court is that this matter has caused not only Mr. Patel a

2    great deal of stress and strife, but also his family.  And when

3    you understand -- when you hear terms like life in prison, when

4    you hear those types of things and that's pressing on you for

5    two or three years and you're waiting for the day of reckoning

6    before Your Honor, that type of pressure and that type of

7    suffering that an individual suffers I don't think can -- can

8    go long.  I do think that's a form of punishment in and of

9    itself.  So the uncertainty and anxiety and depression that

10   affects you and your family members is something I think this

11   Court can give credit to.

12        And I say this because I can remember when I first left

13   the U.S. Attorney's Office, I'll never forget the compassion

14   that I saw before Judge Henry Kennedy, who sat here on the

15   bench in the United States District Court, where I had a client

16   who was going to be sentenced under the guidelines right when

17   the scheme was mandatory, and his guideline range was, I think,

18   18 months in prison on the low end.  And Judge Kennedy looked

19   at him with such understanding and compassion, realizing how

20   this investigation and the uncertainty with the process caused

21   that gentleman such great distress and actually had an impact

22   on the sentence, which ultimately was probation.

23        And, Your Honor, I think the same, you know, holds true

24   for -- for Mr. Patel in this case.  I think it's incumbent upon

25   me to personally share some insight to his character and

1   personality.  Your Honor, he's about the kindness and

2   mild-mannered person that you would meet.  And, you know, it's

3   hard to juxtapose when you see that he's done these things,

4   that, with who he really is, and the conduct here of trying to

5   start a business, which I'll address in a minute, is -- doesn't

6   take away from the fact that he's a good person.  It doesn't

7   take away the fact that he [sic] loved to sit down with him and

8   have an intellectual discussion on current events, perhaps our

9   election or our legal process, or anything else that's going on

10  in the world.

11       And so when I act as his adviser and counselor, I'm

12  struck by the unique person that -- that he is.  I think he's

13  always handled himself with a tremendous amount of dignity and

14  a tremendous amount of courage dealing with what I would

15  consider is a -- a very difficult submission.

16       But, Your Honor, you don't have to take my word for it

17  because I think when you look at the number of letters that we

18  have submitted to the Court for consideration, they have a

19  common theme.  They depict a man who is devoted to his family.

20  They depict a man who's devoted to his community.  They depict

21  a man who was kind and generous.  When a friend needs some

22  help, he's always among the first to help and offer assistance

23  by way of helping to do a chore or financial assistance.

24       He's deeply religious and volunteers time to his

25  community and offers financial assistance to -- to the mosque

1    and others in need.  And so I submit to the Court that those

2    letters we submitted present a mosaic of a man, that reflect a

3    lifetime of good nature, good deeds, and positive traits.  They

4    stand in stark contrast to the man who has broken the law, but

5    the Court can rely upon those as an assurance that he will

6    never engage in criminal conduct again.

7         Your Honor, turning to the kind of offense conduct.  I

8    respectfully submit that a sentence of 20 months is sufficient

9    but not greater than necessary, and I'd like to begin by saying

10   from Jump Street -- you know, Mr. Lal mentioned 2004.  That's

11   16 years ago.  Mr. Patel was a much younger man, as was I, and,

12   you know, he was in over his head when he got into this

13   business.  He didn't enter this arena of operating a

14   PayPal-type business with nefarious intent.  He believed that

15   he could be a genuine competitor to such a big platform and

16   succeed, and I respectfully submit that his ambition and his

17   drive to succeed was his downfall.  He lacked resources.  He

18   lacked knowledge to lawfully run a business in Canada that

19   actually did business within the confines of the United States.

20        And so what -- I'd like to put this case into con- --

21   context.  You know, he's presented with compliance issues that

22   are complex which would shut his business down.  He sought

23   work-arounds.  And, you know, first he tried to argue that he

24   was not in the business of money transmittal because he came up

25   with this theory that he read on the internet that these were

1    prepaid cards and, therefore, not transferring money.  When he

2    got opinions that he didn't like, he continued on.

3        As Mr. Lal points out, he tried to merge with Obopay to

4    get certain licenses because he thought if I could just get to

5    where I can get and I can get more money and I can get into

6    compliance, this will all work itself out.  Of course it

7    didn't.  And he's wrong.  And he cut corners, and he

8    selectively followed pieces of advice that he got, and there's

9    no justification for it.  And so I want to -- the Court to

10   understand that he expects, you know, to be punished, and he

11   understands that he made these bad choices, and he himself is

12   to blame for hurting himself and his family in these

13   processes.

14       I would like the Court -- because I think this is where

15   the rubber kind of meets the road -- to -- to, you know,

16   reflect upon the cases that we present to litigation.  And so

17   when you have household names in the industry with big

18   compliance departments, they have the biggest law firms in the

19   United States giving them advice, they too fall into

20   significant compliance issues.  And I can't speak to why the

21   government doesn't prosecute PayPal or Square in instances like

22   this.  But, frankly, I was taken aback when I read that PayPal

23   had transactions that involved, you know, people in the

24   specially designated terrorist list, and nothing happened to

25   anybody but them paying money back.

1     Those are things that -- that are significant to me.

2     They have thousands of employees.  They have outside legal

3     counsel.  They had millions of dollars in start-up capital and

4     yet on compliance issues, on licenses and following

5     regulations, both PayPal and Square made mistakes.  And so

6     we're in a context here where obviously Mr. Patel made these

7     mistakes, but he's being held to an extremely high standard.

8     And so the other thing that I'd like to point out when

9     the government does prosecute people -- and I've pointed out in

10     a number of cases -- but the three strike me as significant.

11     The first is the *Diaz* case, which we submitted to the Court.

12     Both men went to trial.  They transferred more than a hundred

13     million dollars all over the world, including Venezuela, which

14     is a taboo country.  It's on the OFAC list.  They oppress their

15     people.  It's an enemy of the United States.  And those

16     gentlemen went to trial, didn't accept responsibility like both

17     Mr. Patels, and they were given sentences, at the end of the

18     day, of eight and four months, respectfully.  They were father

19     and son, and that difference was the relative culpability,

20     similar to what you have here.

21     The second case that I think is important is the *Kaganov*

22     case.  That gentleman used shell corporations to hide illegal

23     activities.  He funneled more than $170 million into the

24     United States and then back out to more than 50 countries.  He

25     didn't have licenses like the Patels, and the government capped

1   its allocution in that case to 9 -- allocution to 18 months,

2   and he was given a probationary sentence.

3        I respectfully submit to the Court that the loss amount

4   in this case is simply not indicative of loss, of course.  It's

5   just because the Patels didn't have the requisite licenses, and

6   that's why we have such overstated guidelines.

7        In the *Rombakh* case, the defendant transferred over

8   $150 million over five years.  His -- he claimed his funds were

9   used to fund a mining operation that may not have actually

10  existed.  He was given a two-year sentence, which would be, you

11  know, similar to what we're asking for here.

12       And when I heard Mr. Lal, you know, talk about the fact

13  that Ponzi schemes and things were run, you know, I don't

14  dispute that, but, you know, Bernie Madoff operated probably

15  the biggest, you know, Ponzi scheme in the world, and he was

16  able to operate within the confines of traditional bankings

17  that were licensed.  So just because people transfer money on

18  these platforms doesn't necessarily mean that, you know, people

19  aren't going to engage in these types of payments.  They do it

20  on Square.  They do it on PayPal.  They do it via wire.  They

21  do it via check.  And so if someone has the -- the gumption to

22  start a criminal enterprise, they're going to find a way to do

23  it whether Mr. Patel processes the payments or not.  It doesn't

24  legitimize the fact that he operated without licenses, and I

25  don't want the Court to hear me saying that.  But I do think it

1    puts into context what an appropriate sentence should be here.

2          In closing, Your Honor, I would like to point out a

3    couple of other things.  The first is, obviously, we're in the

4    middle of a pandemic that none of us has seen in our lifetime.

5    None of us understand it.  The BOP never anticipated something

6    like this to run.  They're currently operation -- operating on

7    modified operations.  I know that, based on my check of their

8    website today, there are positive tests in 114 facilities, and

9    so far to date 18,500 inmates have tested positive for it.  I

10   would respectfully submit that a danger in susceptibility from

11   being in prison is something that you must consider in terms of

12   what is a reasonable sentence under this day and age.

13         Second, I know I've discussed the notion of a *Smith*

14   departure for the Court, and it's not uncommon in cases like

15   this.  And I would like the Court to utilize the *Smith*

16   departure in the context of giving Mr. Patel a lower sentence

17   because he will not be eligible for halfway house time.  He

18   will not be eligible for certain types of programs that can

19   reduce his sentence.  And if he doesn't work out the treaty

20   transfer, he can be incarcerated more so than any of us have

21   anticipated, and so I think that's something that the Court

22   should consider.

23         Finally, Your Honor, I would ask the Court for

24   placement -- and it's a recommendation, obviously, for the BOP,

25   who's not bound by it, but a recommendation for a placement at

1  FCI Danbury.  Mr. Patel's family lives in Canada.  That's the

2  closest-like facility where I believe he can be housed due to

3  his immigration status.  He would ordinarily be camp eligible

4  if he were a U.S. citizen.  He's now going to be designated at

5  least at a low, and Danbury is the closest place to his family.

6      And lastly, Your Honor, I know the Court has read our

7  memo and seen that his wife has some difficulties.  We'd ask

8  the Court to delay his self-report until the end of February.

9  I've discussed it with Mr. Lal, who didn't object when we

10  discussed it this morning, but it would help him -- you know,

11  hopefully the pandemic will -- will calm down such by then,

12  we'll be through most of flu season, and he can get his, you

13  know, financial house in order and his home in order in terms

14  of caring for his wife.

15      Your Honor, I really appreciate your consideration.  I

16  know these sentences are not easy, and I thank the Court.

17          THE COURT:  Thank you, Mr. Onorato.

18      Mr. Firoz Patel, do you have something that you would

19  like to say concerning the sentence that the Court will impose

20  in this case?  Now would be the time.

21          MR. FIROZ PATEL:  Yes, Your Honor.  I'm not sure

22  where to begin, but I guess I'd like to begin by saying that

23  I'm obviously extremely very sorry for my conduct in this

24  matter and -- and the issues I created by helping the business

25  without the -- having the proper licenses.

1          Naturally, as Mr. Onorato had said on my behalf, you

2     know, when I started this business in processing payments

3     electronically about 15 years ago -- you know, it's a long time

4     ago, obviously.  It's 2004, 2005 -- I was certainly naive and

5     uneducated in -- you know, in regards to regulations and

6     licensing requirements, you know, that were imposed on to us.

7     So we actually had no idea that there was such licensing

8     requirements.  We didn't even know where to look.  There's no

9     guideline.  There's no mentor that we looked up to.  There was

10    nothing at all that was actually given to us.  We really had to

11    just figure it out on our own.  You know, we were not funded.

12    You know, whatever money that was actually -- that I had in

13    savings or that I used, actually essentially earned my way into

14    a business of this nature, you know, to grow it.

15         You know, we started with a small team of six people.  I

16    had to learn everything by trial and error, by using Google and

17    other resources at the time, considering all resources,

18    including Google, were somewhat new.  It wasn't as

19    sophisticated as -- as it is today.  You know how Google is

20    used in such -- such manner to finding a lot of resources

21    today.  It's not the same thing back in 2005 or '06 or earlier.

22         Somewhere along the way I lost myself in the pursuit of

23    growing the business.  You know, I started to cut corners.  I

24    sought opinions to justify what I was doing because I knew

25    there was no way to get into full compliance with the limited

1    resources we had.  You know, the legal costs were astronomical

2    considering that this was the size that we were.  You know, we

3    had to pay an attorney, you know, $800 an hour for advice,

4    which was very difficult to swallow.  When we weren't even

5    making that much money, you know, whether or not we were making

6    that money within a day or even the week, we were blowing that

7    in an hour.  I convinced myself if we could turn a corner, we

8    would be profitable enough to put eventually the controls in

9    place and it all would be eventually okay.

10        You know today, certainly, Your Honor, I stand before

11   Your Honor humbled and ashamed.  I am branded a felon, a

12   criminal.  And I've now got a notoriety based on this case

13   that's caused a lot of harm to myself and my family.  It's not

14   myself so much that I'm feeling more shameful.  It's actually

15   more for my family, what they have to sustain.  We have lost

16   friends.  We've lost -- you know, members of our community have

17   turned their backs on us.  You know, without questioning,

18   without asking questions about what happened, they simply just

19   have walked away, and, you know, it's harmed my family a great

20   deal.  It's caused a lot of humiliation and embarrassment

21   and -- to the point any time I walk around outside, my -- my

22   worry is that somebody is going to accost me on the road of

23   what may have happened or what -- what this is all about.  So

24   it's not just me in the United States, but it's certainly all

25   the way here in my home area, you know, my -- my community area

1    itself.

2         Obviously at this point, you know, as I said, this is 15

3    years ago or more, but since the time that this case was

4    brought forth in March of 2018, I stand before you today

5    obviously older, maturer, and wiser from -- from the actions

6    here.  I understand my role -- my role in these events, as I

7    take full responsibility for my actions.

8         After the charges were filed against me, Your Honor, it

9    took me a while to realize that -- you know, where I went

10   wrong, you know, where -- where I let my ambition to succeed

11   and compete with PayPal, a monster system, and how it led me to

12   go astray.  So obviously I'm sorry for that, and it's not what

13   I want to be remembered as.  It's not what I am.  I have

14   learned from mistakes.  I've suffered a number of collateral

15   consequences as a result of my actions.  You know, as you've --

16   as you've heard now, I've had a number of family issues,

17   financial issues and even health issues, that's affected

18   myself and -- and my wife, and possibly others around me as

19   well.

20        You know, basically, the wonder in all this is whether

21   or not the stress that I caused my family is -- is what the

22   reason is for my wife's current illness that she's facing

23   right -- with her anxiety and -- and the -- the -- the

24   dizziness that she feels every day.  You know, that obviously

25   makes me very guilty every single day of my day -- of my life

1    right now, because that's -- that's on me.  It's not her fault.

2         I'm trying to set my life straight.  I can assure -- I

3    can assure you, Your Honor, that this will never happen again.

4    I'll never be, again, brought in front of any court, since I

5    will only be set on the correct and level path.  I can assure

6    this Court that I will never again participate in a regulated

7    business like this so I can avoid the dangers in such

8    businesses in the future.

9         I appreciate that I know now that I must be punished for

10   these actions, and I humbly ask that you allow me to return to

11   my family in Canada as quickly as possible, you know, thereby

12   giving me the shortest sentence possible.  That's it.  You

13   know, I'd like to apologize once again to you and the

14   government for my actions in this case.

15        THE COURT:  All right.  Thank you, Mr. Patel.

16        I'm mindful of the time, but we're going to press on.  I

17   think what we need to do is I would like to go through the same

18   presentence report evaluation, which should go faster now that

19   we have a basis for understanding the facts and calculations in

20   this case, for the remaining two defendants, giving

21   Mr. Ferhan Patel the opportunity to speak and his lawyer the

22   opportunity to argue.  And then we'll take a quick break, and I

23   will come back and impose sentence on everyone at the same

24   time; all right?

25        So with respect to Mr. Ferhan Patel, the final

1   presentence report was also filed on November 3rd.  Let me ask

2   the government if there's any objection to the factual

3   determinations set forward in that report.

4        MR. LAL:  No objections for the government,

5   Your Honor.

6        THE COURT:  All right.  Mr. Ferhan Patel, are you

7   satisfied with your attorney in this case, and do you feel

8   you've had enough time to talk with him about the presentence

9   report and the government's papers filed in connection with

10  this sentence?

11       MR. FERHAN PATEL:  Yes, I'm very satisfied, and I've

12  had ample time to talk to my lawyers.

13       THE COURT:  Okay.  Mr. Trusty, have you and your

14  client read and discussed the presentence report, and are there

15  any objections to any of the facts as stated in that document?

16       MR. TRUSTY:  Your Honor, we have discussed the

17  presentence report and the earlier draft form of it and the

18  government's memo.  We have no objections to the factual

19  components of the final PSR.

20       THE COURT:  All right.  Hearing no objection, the

21  Court will accept the factual recitation in the presentence

22  report for Ferhan Patel regarding the circumstances of the

23  offense and his history and characteristics, and, therefore,

24  the facts as stated will be my findings of fact for the purpose

25  of sentencing.

1    The presentence report lays out the probation office's

2    calculation using the 2018 *Guidelines Manual*.  It is similar to

3    the calculation that was previously discussed, although there's

4    only one count in this superseding information.  The applicable

5    guideline for that count is 2S1.1.  Starts with a base offense

6    level of 8; 28 levels are added because of the value of the

7    offense at more than 250 million but less than 550 million;

8    bringing the base offense level to 36.

9    The presentence report indicates two specific offense

10   characteristics are applicable:  a 4-level increase under

11   2S1.1(b)(2)(C) for being in the business of laundering funds

12   and a 2-level increase under 2S1.1(b)(3) because the offense

13   involves sophisticated money laundering.

14   The presentence report also includes a role adjustment

15   under 3B1.1(a) for qualification as an organizer or leader of a

16   criminal activity involving more than five participants, and

17   that's a 4-level enhancement.

18   The government has represented that Mr. Ferhan Patel has

19   demonstrated acceptance of responsibility in a manner that

20   entitles him to 2-level reduction under 3E1.1(a) and that he

21   has timely notified the government of his intention to plead

22   guilty in a manner that entitles him to an additional 1-level

23   reduction under 3E1.1(b).

24   Therefore, according to the presentence report, prior to

25   any consideration of departures or variances, Mr. Ferhan

```
1    Patel's total offense level is 43.  Again, you know, I note

2    that the parties have reached a different outcome than the

3    guideline calculation, they have not applied -- in the plea

4    agreement, they have not applied the 2-level offense

5    characteristic for sophisticated money laundering.

6         Mr. Trusty and Mr. Lal, I don't know whether you want to

7    address this disparity or whether you'd like the Court to

8    proceed essentially as I did with Mr. Firoz Patel.

9         MR. LAL:  Your Honor, on behalf of the government,

10   consistent with my comments with respect to Defendant Firoz

11   Patel, I don't have anything further to add, and I would ask

12   the Court to just carry forward.

13        THE COURT:  All right.  Mr. Trusty.

14        MR. TRUSTY:  Similarly, Your Honor, we stand by our

15   stipulated calculations and have nothing to add to the

16   probation calculation except to urge the Court to continue

17   forward with the parameters of the plea that we have in

18   place.

19        THE COURT:  All right.  So the Court will adopt the

20   plea -- the probation office's calculation, which has us at 43

21   at this point, understanding that it differs from the parties'

22   plea agreement, but given the representations made, I think we

23   will just proceed.

24        As far as the criminal history category is concerned,

25   the presentence investigation has found that Mr. Ferhan Patel
```

1      has zero prior convictions that receive criminal history

2      points.  This gives him a criminal history point subtotal of

3      zero, and he's in Criminal History Category I.

4           Are there any objections to this criminal history

5      calculation?

6                MR. LAL:  Not on behalf of the government.

7                MR. TRUSTY:  And none from Mr. Patel.

8                THE COURT:  All right.  So given Criminal History

9      Category I, an adjusted offense level of 43, we have the same

10     life imprisonment determination under the guidelines, but the

11     maximum sentence authorized by the relevant statute is

12     substantially less.  It is 60 months of imprisonment per -- and

13     per 5G1.1(a) of the *Guidelines Manual*, that becomes the

14     relevant guideline sentence.

15          Is there any objections to the guideline calculation

16     that are not already noted?

17               MR. TRUSTY:  No, Your Honor.

18               MR. LAL:  Not on behalf of the government,

19     Your Honor.

20               MR. TRUSTY:  Not for Ferhan Patel either.

21               THE COURT:  All right.  I am assuming that the same

22     departure consideration mentioned appears in Mr. Ferhan Patel's

23     PSR.  Let me double-check.  That is referenced.  Are there any

24     other departure considerations that the Court should keep in

25     mind at this point as distinguished from a variance?

1          MR. LAL:  No, Your Honor.

2          MR. TRUSTY:  No, Your Honor.

3          THE COURT:  Okay.  I did already go through the

4    parameters of a -- the charge of conspiracy to commit crimes

5    against the United States.  That was Count 1 of the two counts

6    in Mr. Firoz [sic] Patel's indictment -- or superseding

7    information.  There is a maximum penalty of five years, no

8    mandatory minimum, no eligibility of probation under the

9    guidelines, although there is eligibility under the statute.

10   However, the parties' binding plea agreement does contemplate a

11   period of incarceration in this case.  A supervised release

12   range of no more than three years is applicable.  The

13   guidelines provide one to three years.  We have the same

14   maximum fine of $250,000, while the guideline fine range is

15   between 50,000 and 500,000.  And as with Mr. Firoz Patel, the

16   probation office has determined that restitution is

17   impracticable.

18          Have I accurately stated the guideline and statutory

19   framework, Mr. Lal?

20          MR. LAL:  Yes, you have, Your Honor.

21          THE COURT:  And Mr. Trusty.

22          MR. TRUSTY:  Yes, Your Honor.

23          THE COURT:  And we do have carrying over as well the

24   discussions with respect to the forfeiture.  I have the final

25   consent order of forfeiture, which has Mr. Ferhan Patel

1    forfeiting a money judgment in the amount of $4,350,459.45.

2         All right.  Let me now turn to Mr. Lal for a

3    determination of whether the government would like to speak

4    to -- again, about the sentencing factors as they bear on

5    Mr. Ferhan Patel's final sentence.

6         MR. LAL:  Your Honor, many of my comments are,

7    frankly, the same given that the two brothers created and

8    operated these businesses together.  The reason for the

9    government's allocution for a lower sentence for Mr. Ferhan

10   Patel is his smaller or his -- I mean, he still had a senior

11   role in the company, but it was lower than his brother's.  In

12   addition, he does not have the second case that he's pleading

13   guilty to, and it's for that reason that the government

14   allocutes for a 24-month sentence for Mr. Ferhan Patel.

15        If there's anything, sort of, beyond that general

16   description, if the Court would like me to respond to, I can,

17   but that's the government's allocution, along with three years

18   of supervised release for the same reasons that I articulated

19   with respect to Mr. Firoz Patel.

20        THE COURT:  All right.  And that sentence is in the

21   middle of the negotiated guideline range for Ferhan Patel of

22   between 12 and 36 months; correct?

23        MR. LAL:  That is correct, Your Honor.

24        THE COURT:  Okay.  Mr. Trusty.

25        MR. TRUSTY:  Your Honor, thank you.  And I am mindful

1   of time, but I hope that the Court can maintain the patience

2   you've already shown and allow me to shed some light on

3   Mr. Ferhan Patel's character in particular, but I'll start

4   with maybe more ministerial components of -- of what I have to

5   say.

6          The first is to go back to, I guess, 2018 and thank this

7   Court for taking a chance on Ferhan Patel.  I mean, we had a

8   very hotly contested detention hearing with Mr. Lal's

9   predecessor, and we had a lot of pretty significant scrapping

10  over things like transactional volume and loss and risk of

11  flight; and this Court was looking at a defendant who was

12  indicted, who lived in another country, and who was being

13  alleged to have been involved in, you know, hundreds of

14  millions of dollars worth of loss.

15         And I don't think the Court took that decision lightly,

16  and, you know, Your Honor didn't know Ferhan Patel.  Frankly, I

17  don't think you knew me, and, you know, we sit here two and a

18  half years later with a gentleman before you who has been

19  spotless in his compliance.  And I'll circle back to why I

20  think that's so significant in terms of Your Honor fashioning a

21  sentence today.

22         But the Court clearly took a chance in terms of putting

23  some faith in Ferhan Patel and -- and giving him an opportunity

24  to either fail miserably or to rise to the occasion and show

25  something of his character just by complying with the Court.

1    And so, again, I know he would want me to thank you, and I

2    thank you for taking that opportunity and -- and seeing that it

3    played out the way it did.

4         I suppose the other thing that's easier about going

5    second after Mr. Onorato is I can just tell the Court I'm happy

6    to adopt and incorporate many of his arguments, but,

7    specifically, I would just say his assessment of the guidelines

8    as draconian in this situation is spot on.  His comments about

9    PayPal and Square and, kind of, the difficulties of payment

10   processing, and even the most successful ventures and how they

11   tend to shade to the gray rather than clear black and white,

12   and then his assessment, which is in his memo, in -- in fuller

13   length about the comparative cases and some of the sentences

14   that have been meted out in the context of payment processors.

15        Also, just in terms of the *Smith* departure, same thing.

16   We think that, you know, in a sense we are penalized for being

17   a foreign national and that that should be at least a factor --

18   hard to measure one, perhaps, but a factor in the Court's

19   meting out of a sentence.

20        Also along the lines of maybe a more ministerial

21   component before turning to the -- to the real meat of the

22   matter, I had one concern that I wanted to address to the Court

23   about the government's sentencing memorandum.  And that's on

24   page 12 where -- and I called Mr. Lal to kind of forecast this

25   issue last night and see if we can try to resolve it.  But on

1    page 12 of the government's memo, it lays out for the Court a

2    draft PSR calculation that included the, I think, 4- or 6-level

3    bump for steroids in that initial calculation.

4         And now that's not the U.S. Attorney's Office's

5    stipulated position, nor is it ours, and nor is it in the final

6    PSR.  The final PSR in paragraph 11 calculates the guidelines

7    without that enhancement for the steroids.  And -- and, again,

8    we -- we didn't accept facts that establish it.  We're not part

9    of the Nashville case, and so it made sense for that not to be

10   included in the guideline calculation for Mr. Patel.

11        My concern about the inclusion of that is, kind of,

12   twofold.  First, there's at least a mild suggestion that it's

13   the government, kind of, winking at its own stipulation and

14   saying, you know, well, gee, Judge, we stipulated this but it's

15   really this plus 6.  But maybe more fundamentally -- and,

16   again, I talked to Mr. Lal about that, and I don't think that

17   he's going to, you know, say that's what he's trying to do, and

18   I accept that.

19        But the other part is it's referring to a private

20   document.  As I understand the process here, the whole purpose

21   of the draft PSR circulation to the parties is to essentially

22   correct anything that might be wrong before the Court is

23   immersed in the final PSR.  And so we have a nonpublic

24   document, the draft PSR, being referred to in a public

25   document, the government's sentencing memorandum.  And so,

1    again, my suggestion would be to either, you know, ask Mr. Lal

2    to submit an amended version that just literally strikes that

3    component or that we redact that component, but I don't think

4    it's particularly fair for Mr. Patel to have that nonpublic

5    aspect of the guideline calculation within this document

6    that's, you know --

7            THE COURT:  Let me just interrupt you and ask Mr. Lal

8    about the suggestion that -- that that paragraph on page 12 be

9    redacted to not reflect in the public's sphere draft

10   presentence report discussions.

11           MR. LAL:  Your Honor, it was my intention as I was

12   drafting my sentencing memoranda, to point out to the Court the

13   difference between the agreement that the parties reached and

14   the calculation that the probation office reached.  The --

15   and -- and I would note that although there's a reference to

16   the six levels, there's a footnote there that says that this

17   adjustment is not applicable to the defendant.  The parties

18   have explained that the adjustment does not apply to

19   Ferhan Patel on the facts of this case and we anticipate that

20   the final PSR will not include it.  So I think to the extent

21   that there's anyone who was concerned -- to the extent there's

22   any concern that somebody might get the wrong impression, I

23   think that the document as a whole makes it clear.

24           In addition to that, we have discussed on the public

25   record what the final PSR indicates.  I don't think that

1    there's a need for the government to file a redacted copy that

2    makes reference to the draft PSR.  However, I -- if the Court

3    orders me to do so, I will -- I will do so, both --

4    THE COURT:  Well, I think Mr. Trusty's point is well

5    taken.  I'm not sure that I really understand fully what the

6    meaning or, you know, point of talking about the draft

7    calculation is, really, especially when it doesn't apply to

8    this particular defendant, as you note in the footnote.  So to

9    avoid any, you know, confusion, I would think we should just

10   remove that paragraph.

11   MR. LAL:  That's fine.

12   THE COURT:  I don't know the work it's doing, and I

13   think it could be causing more trouble than it's worth.

14   MR. LAL:  That's fine, Your Honor.  I will -- I will

15   file a supplemental -- or an amended one that just deletes that

16   paragraph, and then, in addition, there's a corresponding

17   paragraph with respect to Mr. Firoz Patel that discusses the

18   draft presentence report, and I guess there's one for

19   MH Pillars as well.  I will -- or if there is, I'll just remove

20   all references to the draft PSR and file an amended one.

21   THE COURT:  Thank you.

22   Mr. Trusty.

23   MR. TRUSTY:  Thank you, Mr. Lal.  Thank you,

24   Your Honor.

25   And just one last point about the government's

1    sentencing memo.  I think this is more an artifact of cutting

2    and pasting, but when it refers to the maximum statutory

3    penalties, it refers to money laundering as carrying a

4    potential 20 years, and, of course, it looks like the same

5    language in Firoz Patel's sentencing memorandum when it comes

6    to that, but we've pled to a 371 violation.  It only has the

7    60-year cap.

8          So it might be while you're in the business of doing a

9    quick cleanup, you can -- you might choose to change that as

10   well.  I'm sure there's confusion for the Court.

11         THE COURT:  I'll leave it to Mr. Lal.  I think the

12   Court's record has been very clear about what facts each

13   defendant has pled guilty to and what the Court is sentencing

14   with respect to.

15         MR. TRUSTY:  Absolutely.  Thank you, Your Honor.

16         And, Your Honor, just -- while I've been talking a

17   little bit about the guidelines, and without belaboring it, I

18   would say that they are, you know, spectacularly overstated in

19   this case.  And, really, one kind of substantial example of

20   that is in the government's sentencing memorandum it talks

21   about in October of 2012 a transaction in -- or transactions in

22   California and says that there were transactions to the total

23   amount of $1,156,412.  And it goes on to mention and the fees

24   that were collected from that were 27,000 -- or a little under

25   28,000.  And that was really, again, kind of the battleground

1     during the detention phase of this case and one that continues

2     to -- to underscore how inflated these, you know, life

3     guideline calculations are.

4          It's just -- it's not that it's incorrect.  It's not

5     mathematically wrong or legally wrong.  It's just a defect of

6     the guidelines that treat transactional volume in such a

7     draconian fashion.  So, again, you know, we don't have go there

8     that far except to say I think the government acknowledges the

9     absurdity of these guidelines to a degree in entering into the

10    plea agreements that we have here.  I mean, obviously their

11    plea agreements are dramatically below these guidelines, and

12    that's not out of weakness or fear or insufficiency or -- or

13    fighting with the defendants.  That's a reflection of really

14    what these guidelines -- how they fail in a case like this.

15         I want to spend a couple of minutes, at most, about the

16    offense conduct, just to kind of emphasize a few points here

17    that particularly relate to Ferhan Patel, Your Honor.  And the

18    first thing is this is really a case about licensing and know

19    your customer, you know, KYC, and in the beginning that had

20    nothing to do Ferhan Patel.  In fact, when he finally came on,

21    he started off as a marketing guy, not as anybody dealing with

22    compliance, and, of course, he left Payza and his brother's

23    employ before -- before law enforcement got involved in this

24    case.  In the middle there was certainly a role and a role that

25    has led to criminal liability, starting as a marketer and then,

1    I guess, in July of 2013 in becoming the compliance officer.

2         But I think what the Court has already -- fully

3    understands and has heard repeatedly is there's really no

4    dispute from either defendant or from the government, for that

5    matter, that it was Firoz Patel that was in charge and that he

6    was the one that made the big decisions.  He was the prime

7    mover, he got things off the ground, and he was the

8    decision-maker as this started to turn south.

9         You know, as Ferhan Patel graduated in his role to being

10   the compliance officer, and as they started to see the walls

11   closing in, whether it was regulators or cease-and-desist

12   orders, licensing problems with Obopay or the audit that they

13   undertook in 2011, Ferhan Patel had a decision to make.  And

14   this was one he'll regret for the rest of his life, and that

15   is, he did not throw down.  He did not go to his brother and

16   say, enough of the lip service.  You know, we're in a

17   disastrous situation here.  We are breaking laws.  We need to

18   stop.  And that never happened.

19        And that's a function not out of some sort of horrible,

20   conspiratorial motive.  That's a function of being a little

21   brother who's over his head.  I mean, both of them were over

22   their heads at that point.  And so, you know, I look at some of

23   the conduct that's in the statement of offense, and I know the

24   government reads it one way.  They read these chapters as, you

25   know, moments of willfulness and this is how we can prove that

1    they were, you know, consciously breaking the law; but I don't

2    think it's quite a fair reading, is that I don't think it's

3    quite as stark as that.

4         I think when they threw clients over towards EgoPay,

5    that was an effort to distance themself from the high risk, to

6    basically let Payza carry on without being associated with the

7    more nefarious types of clients.  When they went to go to

8    Obopay to get licenses, there's nothing illegal about that.  In

9    fact, it makes a lot of sense.  It was just dumb because Obopay

10   was shedding licenses left and right, maybe not so

11   transparently, but they were losing their licenses, and that

12   put our clients in a position where they didn't really get the

13   benefit of -- of working with Obopay.

14        And even when it got down to doing things like internal

15   audits or using prepaid cards to show that we're not touching

16   the accounts, I mean, those are not the types of things that

17   the Bernie Madoffs were doing or that the brazen crooks do.

18   These are things where they were swimming upstream, realizing

19   that they were not exactly keeping up with the types of things

20   they needed to keep up with.  And so -- and, also, I guess I

21   would just add when Ferhan had that period of time as the CCO,

22   he was cooperating with law enforcement too.  I mean, and we

23   talked about this in open court during the detention hearings;

24   that he had made referrals and suspicious activity-type reports

25   to the royal -- the Royal Canadian Mounted Police, to the FBI.

1      I think ICE was in the mix.  I believe there was also a local

2      law enforcement agency in Canada, if I'm remembering correctly.

3      And my client is nodding.  And so this is not this kind of

4      stark, lawless, brazen picture that you sometimes see in fraud

5      cases or in white collar cases.

6           The last overt act of Ferhan Patel in the original

7      indictment was from June of 2014, and then the last, I think,

8      conduct that directly involves him from the statement of

9      offense in support of his plea was from late 2013.  He left his

10     brother's employ in the middle of 2015 and briefly wanted to

11     stay in this field that he had been invested in.  He tried his

12     own hand at a payment processing company briefly, but he

13     quickly realized, you know, finally, we're overmatched and I'm

14     not going into this gray zone and put myself and my family in

15     harm's way.

16          And so he educated himself and got certifications and

17     did things to continue his basis of knowledge, but then he

18     moved on to focus on marketing and no more of this payment

19     processing.

20          So then, Your Honor, we fast-forward not too long, a

21     couple years, to March of 2018, when Ferhan is arrested at the

22     Detroit airport.  He bounces around facilities.  As we all

23     know, the federal system has this kind of slow boat through

24     Oklahoma, but he bounces around different facilities.  And I

25     met Mr. Patel in -- I think in either April or May -- I think

1       it was April of 2018.  And I've been trying to think of a way

2       to characterize his demeanor to this Court.  And he's been very

3       consistent, you know, for these years in terms of how he

4       approaches this and how the guilt and shame that he feels and

5       the harm that he's suffering acutely in terms of his family's

6       harm.  But I was trying to think of the right phrase, and, you

7       know, one thing that comes to mind sometimes is you say he was

8       a beaten man, and I don't think that's the right way to look at

9       it.  I mean, to me, a beaten man sounds like somebody who chose

10      to break the law, wanted to profit from it and then finally law

11      enforcement caught up with him.  And that's never really been

12      the right phrase that -- the kind of degree of selfishness that

13      you would see to -- to accommodate that phrase.

14              I actually think remorseful man works.  I mean, this was

15      a person when I met him at the -- in Farmville, Virginia, on a

16      Saturday afternoon, you know, was immediately remorseful, sorry

17      his family was going through this, and I don't think that's

18      ever changed.  I haven't seen any real evolution or devolution

19      of -- of his sense of shame and of his guilt and the fact that,

20      you know, he participated in shortcuts.  And he knows very

21      acutely that this has hurt his wife, who is present here

22      because of the nature of these Zoom proceedings, at his side,

23      and it has an effect, unfortunately, on Hamz and Maya, on his

24      two children.

25              And this is not the type of person that sits here and

1    mutters under his breath that it's law enforcement's fault or

2    he blames the prosecutor, he blames the criminal justice

3    system.  This is a person whose enjoyed a very strong

4    reputation for many years and has done wonderful things in his

5    life and actually feels remorse.  And it's a nice thing to be

6    able to say that confidently as his counsel because you maybe

7    don't always have that from every client, but you have it here.

8          Your Honor, the most important notion today, as

9    Your Honor obviously knows, is to find that sweet spot where

10   punishment is accommodated but it's just sufficient.  It's

11   sufficient enough to deter this man from ever coming back into

12   the criminal justice system.  And I would submit to you that

13   there's almost no question that you will not see Ferhan Patel

14   in trouble again.  You will not see him in the criminal justice

15   system again.  Maybe you'll see good things about him in

16   different realms of life, but not to do with criminality.

17         And I would submit that there's really three related

18   reasons that support these kind of individual characteristic

19   findings under 18 U.S.C. 3553(a).  Three different reasons that

20   all essentially relate to his character, his trustworthiness,

21   that I hope this Court will consider in fashioning a sentence.

22   And, of course, we're asking for a sentence of 366 days of

23   executed incarceration.

24         The first is his track record on pretrial release that I

25   mentioned briefly before.  I mean, I would suggest that if he

1    was going to fail in terms of earning this Court's trust and

2    respecting the criminal justice system, you'd see some sign of

3    that by now, but, instead, you have perfect compliance.  He was

4    released to his brother-in-law's house in the Eastern District

5    of New York, was there for eight and a half months without even

6    a hiccup, never any sort of difficulty there.

7            During that time, the Court will probably remember

8    several different filings that were made by myself to

9    accommodate visits with his family.  You know, can he leave the

10   house and go take them on a Sunday picnic?  And each time the

11   Court did that, no hiccups, no problems, and complete perfect

12   compliance.  I mean, he's probably been one of the easier

13   pretrial services release candidates that -- that any of us

14   will ever see, and, again, it's not fleeting.  It's an

15   eight-and-a-half-month period at his brother-in-law's home

16   where he did these things.

17           Since he was released to his home, we've had another, I

18   think, about 20 months now of spotless compliance.  I mean

19   perfect compliance.  There was a report from pretrial services

20   confirming that yet again that came through last night.  And I

21   would argue that this is a great predictor of how he will do on

22   supervised release.  This is not, you know, kind of the quick,

23   you know -- what do they call it? -- foxhole Christian moment,

24   which is kind of ironic here, but, you know, the idea that

25   they're only going to be compliant because they're so fearful

1     of -- of punishment, well, we're way past that when we start

2     talking about 20 months with his family, 8 and a half months

3     with his brother-in-law.  And I think it's not just a -- a

4     predictor of how he'll do on supervised release but a real

5     indicator that 366 days of incarceration is, frankly, more than

6     enough to serve as a successful deterrent in this individual's

7     case.

8          So the second reason it relates to character, I guess,

9     is character.  I mean, we submitted, I think, 23 letters -- and

10    thank you, Your Honor, for taking the one that was late, that

11    came in today, as well.  I know the Court takes these seriously

12    and reads them.  I don't -- I will not subject anyone to the

13    torture of reading through them verbatim, but there -- I would

14    just say there's some commonalities.  Many of them are from

15    very successful, very well-educated, well-spoken individuals,

16    and there are some themes that come through.

17         They refer to him as generous.  There's a number that

18    refer to him as a coach or a mentor, going back to school or to

19    work.  They've referred to him as kind.  They've referred to

20    him as loving his family and being loyal to friends and family.

21    And, again, these are from all walks of life.  These are people

22    that knew him from school, people from business.  And, of

23    course, his wife had a very poignant submission for this Court

24    to consider as well, just in terms of the man she knows, the

25    character he holds, and the impact to her of -- of his choice

1    to -- to engage in criminality here and the consequences that

2    flow from that.

3         There are two very quick highlights that I do want to

4    just mention from all these letters.  It's probably unfair

5    because there's a lot of good highlights in a lot of them.  I

6    just think there's two very quick ones that are worthy of -- of

7    reflection because they really are great factual

8    vignettes about what makes this man tick.  And the first is

9    from Amin Dada.  And Amin basically describes Ferhan as a coach

10   and somebody that's helped him as he tried to go into his own

11   financial businesses.  And if you -- on that letter at the end

12   of the first page, spilling into the second, he refers to a

13   business that he had failing around 2017 or '18.  He said, "I

14   also lost all the investment since the business is still

15   operational but not making enough profit to pay back dividends

16   and each of the investors including Ferhan."  Ferhan "simply

17   told me 'don't worry, everybody fails sometimes, we are with

18   you in your next journey.'"

19        And that is, again, a quick version of something you see

20   through a lot of these letters, just a very positive influence

21   in people's lives, somebody who wants them to succeed.  Even

22   when he could crawl into a shell of self-pity or shame, he's --

23   he's out there, you know, helping other people and trying to

24   make sure they understand that he will support them through the

25   thick and thin of life.  And I think, you know, all of us would

1    benefit from friends with that mentality.

2         The other one, Your Honor, that -- again, last of the 23

3    that I'm going to highlight -- is from Iram Khan Ansari.  And

4    this was a person who's now a successful technology lawyer,

5    author, and filmmaker in San Francisco, but at the time knew

6    Ferhan from school.  And she described a situation where she

7    wanted to be a young, you know, soon-to-be lawyer -- God help

8    her -- but that she was going to wear her Muslim head scarf and

9    that at 19 she was concerned that this would somehow be a

10   problem in -- in the practice of law.

11        And she says, "I walked into the Muslim Students'

12   Association office at Champlain College in tears and Ferhan was

13   on office duty that day.  I asked him 'do you think I can still

14   be a lawyer if I wear the hijab?'  His immediate response,

15   without a flinch, was 'Of course.  You can be the first.'"  And

16   she wrote, "This story highlights the essence of Ferhan - that

17   he is someone who not only valued education and playing by the

18   rules, but was also" of high -- "someone of high empathy."

19   And, again, there's much more, but I think those two go a long

20   way to kind of giving a good iconic story of what this man does

21   with his life and the things he's been able to do.

22        And that leads me to the last area that has to do with

23   character, which is kind of an extraordinarily unusual one.

24   We've put out in the memo on pages 8 through 10 in much more

25   detail, but, Your Honor, these were the efforts to cooperate.

1    And let me just say in terms of framework, I'm not -- I'm

2    familiar with a little bit of case law over the years that

3    deals with 5K1.1 departures being kind of forced upon the

4    government in a very rare circumstance and not one that we're

5    pursuing here, and it requires kind of outrageous bad faith on

6    behalf of the government to ever get to that juncture.  That's

7    not where we are.  We're asking you to consider this.  Again,

8    it's just evidence of his character, evidence of his acceptance

9    of responsibility, and his actual remorse, all of that under

10   3553.

11        But what we conveyed to Mr. Lal's predecessor was that

12   even years downstream, as it has been, Mr. Patel was in a

13   situation where he could provide some helpful, you know,

14   tangible information to the government to continue their

15   investigation.  And, in fact, they even seized assets.  He had

16   bank accounts and passwords for an EgoPay bank account for

17   $402,000 just sitting there.  He also informed them through

18   counsel that he could help them build a case against a Canadian

19   money transmitter organization that was already on the map with

20   law enforcement, already had had some -- some inquiries or

21   issues with negative reports, and that he thought that he was

22   in a position where he could, you know, again, help them.  And

23   they were operating in the U.S., not just Canada.

24        And what followed was just kind of a strange exchange

25   here.  It's -- it's not a situation where the government ever

1    said this is not substantial or this is not honest, you know,

2    the usual touchstones for a 5K departure and for cooperation in

3    general.  They basically said:  The AUSA on the case is leaving

4    and there's really nobody else that has the ability or the

5    interest in running with it.  I mean, it really came down to a

6    resource decision more than anything ever conveyed to us.

7         And, of course, Mr. Patel was willing to do a proffer on

8    these lines.  We never really got past the attorney proffer,

9    but it was never framed in terms of we don't want his

10   cooperation because he's not honest or it's not something

11   that's substantial.  But, again, it was just kind of this

12   inexplicable resources issue.  And, again, I'm not trying to

13   disparage the U.S. Attorney's Office or disagree with them when

14   it comes to limited resources.  I'm not trying to force a 5K or

15   anything like that.  I'm just saying this is another bit of

16   evidence of Ferhan Patel's acceptance of his remorse, of his

17   desire to make things right.  And I think it's a fair one for

18   the Court to consider in imposing a sentence of a year and a

19   day.

20        So I'll leave you with this, Your Honor:  In terms of a

21   fair sentence here, I mean, whatever the Court does within this

22   (c) plea range, you are imposing punishment.  It's clear that

23   this family and Ferhan Patel himself is going to feel

24   punishment.  We think a year and a day is sufficient

25   punishment.  He does not have the opportunity for a minimal

1   security facility because of his citizenship.  He doesn't have,

2   as -- as Mr. Onorato talked about for the *Smith* case, basis for

3   departures and variances; that he won't have the opportunity

4   for any sort of halfway house before final release.

5        We're also asking for FCI Danbury as a recommendation

6   from this Court because of its location and also, in part,

7   because it's at least geared towards immigration facilities

8   where there's at least the legitimate hope that his sentence

9   won't be practically extended by immigration authorities taking

10  their time to -- to deport him at the end.  It is likely a

11  facility that will continue to have COVID-19 problems.  I mean,

12  frankly, it was one of the two facilities specifically named by

13  the Attorney General when he first started to push BOP to come

14  up with measures to protect their inmates.

15       He's going to have that immigration detainer, and it may

16  very well have some effect on his sentence to add to it.  He

17  has, by my count, 58 days he was incarcerated from Detroit to

18  his release to his brother-in-law.  So I hope the Court will

19  also include that credit for time served -- or that

20  recommendation for credit for time served.

21       But ultimately, Your Honor, he's -- he's punishing

22  himself already.  He's been punishing himself for years for

23  conduct that took place years ago.  He acutely feels the harm

24  that he's caused to his wife and to his two children who have

25  kind of grown up with questions about why Dad's not home and

1    where is Dad going now, but, again, he feels the blame for.

2         Your Honor, I know that --

3         THE COURT:  I am -- I am concerned about our court

4    reporter who's been going now for almost two hours.  And so is

5    there anything more that you want to say?  And I want to give

6    your client the opportunity to speak as well.

7         MR. TRUSTY:  No, perfectly timed.  That's where I was

8    going to stop, and I know my client would like to briefly

9    address the Court, if you can hold on for another 30 seconds.

10        THE COURT:  All right.  Mr. Ferhan Patel.

11        MR. FERHAN PATEL:  Thank you, Your Honor.

12        So, first off, thank you for allowing me the opportunity

13   to speak.  And everything that the lawyers have spoken about, I

14   would like to also state that I accept full responsibility for

15   the facts alleged by the government.  Obviously very deeply

16   ashamed by my role, the mistakes I made, the lack of action,

17   the actions I should have taken, and my lack of judgment.

18        I tried my best when we were making mistakes, I tried to

19   rectify them as we saw the opportunity to do so.  We tried

20   hiring regulatory lawyers.  We tried hiring consultants and

21   advisors how to keep the business afloat while trying to get

22   into compliance.  We made a lot of efforts on the compliance

23   side, but, unfortunately, while we were trying to become

24   compliant, we were fully aware that we were in violation of

25   federal law -- laws while doing so.

1        So the actions thus far have resulted in severe

2    consequences.  I was separated from my family for a period of

3    two months in detention, over eight to ten months -- or eight

4    months at my brother-in-law's house in Long Island, which is a

5    separation.  That's his home, not my family's home.  So it was

6    very difficult to meet with my family during that time as well.

7    So my family suffered as well.  My children suffered.  They had

8    no idea why I could not come home, why I could not return back.

9    The questions were always posed, why can't I come home, why am

10   I there.  So that was a very difficult situation we were in.

11        And at the time of the indictment when I was arrested,

12   at that point I had a newly formed technology company I was

13   working on.  Because of the indictment, I lost that company as

14   well.  I lost my reputation I worked very hard to build over

15   the years.

16        And, you know, as a result of this indictment as well,

17   I've completely left the financial space.  I don't want to be

18   involved in the space.  I don't want to be involved in any area

19   that there is regulatory, gray zones as well.  I want to stay

20   far away from it.  I've moved into a completely different

21   space, marketing.  Marketing is straight forward.  Everyone

22   needs it.  This is the space I'm going to focus in now.  I've

23   acquired about eight marketing certifications during the time

24   of my home detention.  I continue to pursue this space as well.

25   I'm just trying to rebuild myself, rebuild my career, rebuild

1    my name in a completely different space that I work hard for.

2          And I really hope, Your Honor, you see me for truly who

3    I am, from the letters that you saw, from my lawyer's

4    representations, not just how the government has portrayed me

5    over the period of time and, you know, you give me an

6    opportunity -- a second opportunity here.  And I would like to

7    sincerely apologize for any role I had in these illegal

8    activities.

9          Thank you for your consideration.

10          THE COURT:  Thank you, Mr. Patel.

11          So I think we need to take a break.  I know we still

12    have to address MH Pillars.  I intend to do so quickly and then

13    move to sentencing of everyone.  It's now 1:04.  I hate to rush

14    people, but I'm hoping we can be back in six minutes, 1:10, so

15    that I can move to the next stage.

16          All right.  Thank you.

17          (Recess taken.)

18          THE COURT:  So we need to now address the presentence

19    report and guideline calculation as it relates to defendant

20    MH Pillars.  It's my understanding, Mr. Firoz Patel, that you

21    are authorized to speak on behalf of that defendant and you

22    will be doing so; correct?

23          MR. FIROZ PATEL:  Correct.  Yes.

24          THE COURT:  So let's begin with an evaluation of the

25    presentence report just as we did with the other individual

1    defendants.  The final presentence report and recommendation

2    with respect to MH Pillars was filed on November 3rd.

3         Mr. Lal, are there any objections to the factual

4    determinations in that document?

5              MR. LAL:  No objections with respect to the factual

6    assertions in the pretrial services report -- or the

7    presentence report.  I'm sorry.

8              THE COURT:  Okay.  Mr. Firoz Patel, did you discuss

9    the presentence report concerning the probation department's

10   assessment of the company with your lawyer, and are you

11   satisfied with his representation?

12             MR. FIROZ PATEL:  Indeed I am, Your Honor.

13             THE COURT:  Okay.  Mr. Onorato, are you -- you're

14   representing the company as well?

15             MR. ONORATO:  Yes, Your Honor.

16             THE COURT:  Are there any disputed issues of fact?

17             MR. ONORATO:  No, Your Honor.

18             THE COURT:  Okay.  I will accept the factual

19   recitation in the presentence report for the purpose of this

20   sentencing, and they will be my findings of fact.

21         The calculation in the guideline manual was done using

22   the 2018 *Guidelines Manual*.  The report indicates that

23   Chapter 8 applies to corporate defendants, and according to the

24   probation office, if the organization operated primarily for a

25   criminal purpose or primarily by criminal means, the Court must

1      apply 8C1.1, which provides that the fine shall be a set amount

2      sufficient to divest the organization of its net assets,

3      subject to the statutory maximum.

4           Pursuant to this guideline provision, the probation

5      office determined that the guideline fine range is $500,000

6      based on the statutory maximum fine under section 3571(c)(1)

7      and (d) of Title 18 of the United States Code.  Now, I take it,

8      looking at the plea agreement, that the government and the

9      defendant may have disagreement with the fine range.  So I

10     didn't know whether you wanted to discuss that again, given

11     that in the agreement there wasn't really any agreement to a

12     fine.  I don't know that this is anything more than an academic

13     discussion.  But the government and the plea agreement's

14     calculations regarding the fine are different and rely on a

15     different guideline provision.

16          Mr. Lal, you look a little confused.  I don't know

17     whether this is ringing a bell for you.  Maybe it turns out to

18     not be pertinent.  It may not be something you focused on.

19          MR. LAL:  Thank you for that very correct

20     observation, Your Honor.  I'm not sure which -- what the issue

21     was.

22          THE COURT:  Well, let me just speak to it as follows:

23     My understanding is that the probation office had based its

24     fine calculation on, as I said, 8C1.1.  It arrives at that

25     determination because the corporation, just as the individuals,

1    have been convicted of violating 18 U.S.C. § 371.  That

2    criminal offense is referenced ultimately under the guidelines

3    to guideline 2S1.1 given the nature of the underlying conduct

4    and not 2B1.1, which is the basis of the government's guideline

5    fine calculation.  In this situation, 2B1.1 is not directly

6    implicated, just the loss table through the calculation of

7    2S1.1.

8         So when you look at the government's sentencing

9    memoranda -- and we can do this at a later point given the

10   time, but I'm -- I'm specifically referencing page 7 of the

11   government's sentencing memoranda as it talks about Payza,

12   MH Pillars, and the calculation of the fine.  It is being

13   driven by 2B1.1 in a way that the Court finds is actually not

14   applicable under these circumstances.  And the Court also finds

15   that the record is sufficient as a factual matter to support

16   the probation office's conclusion that MH Pillars operated

17   primarily for criminal purpose insofar as its clients and

18   circumstances dealt with, you know, the various kinds of Ponzi

19   schemes, et cetera, that we are discussing.

20        As a result, 8C1.1 applies, and under that guideline, by

21   operation of statutory maximum, the $500,000 fine amount as

22   calculated by the probation office is applicable.  That is

23   substantially less of a fine amount than was calculated through

24   the 2B1.1 -- calculated by the parties in the plea agreement,

25   but, again, this is sort of an academic discussion given that

1   the parties have agreed in a binding plea agreement not to have

2   any fine apply; all right?

3             MR. LAL:  Agreed, Your Honor.

4             THE COURT:  All right.  Thank you.

5        Let me turn to Mr. Onorato.  I don't know if you want to

6   say anything about that.

7             MR. ONORATO:  No, Your Honor.  I agree with the

8   Court's analysis.

9             THE COURT:  All right.  So this is the time now if

10  anybody wants to say anything about the binding recommendation,

11  which the Court understands to be three years of probation and

12  forfeiture as indicated in the final consent order of

13  forfeiture.

14       Maybe, Mr. Lal, you can clarify for me the amount of the

15  forfeiture that you are seeking from MH Pillars.

16            MR. LAL:  Yes, Your Honor.

17            THE COURT:  I have on your final consent order

18  $4,620,459.45.

19            MR. LAL:  That's -- that's correct, Your Honor.

20            THE COURT:  All right.  And that is separate and

21  apart from the amount -- the indistinguishable amount that is

22  also being forfeited by Mr. Patel; correct?

23            MR. LAL:  By Mr. Firoz Patel; correct.

24            THE COURT:  Mr. Firoz Patel, yes.

25            MR. LAL:  Yes.  That's correct.

1          THE COURT:  All right.  Okay.  So does the government

2     wish to address anything else concerning 3553(a)?

3          MR. LAL:  Just two things, Your Honor.  One is that,

4     sort of, similar to the two individual defendants, the

5     corporate defendant here, when it chose to, sort of, conduct

6     the way that it conducted its operation the way that it did, it

7     played a critical role in the underlying fraud.  Any kind of

8     fraud, whether it's a pyramid or Ponzi scheme or some other

9     kind of fraud, has to have a way for the perpetrator to get

10    money from the victims.

11         Here, that's what Payza -- that's the role that Payza

12    played.  Operating an unlicensed money service business is a

13    serious offense.  What strikes me as, you know, the fact that

14    Payza is no longer a going concern is of some comfort, but the

15    fact that these individuals and this company, despite -- and I

16    guess it was unfair -- it was AlertPay at the time -- they got

17    information from consultants that they weren't doing things the

18    right way, yet they continued to do the things the exact same

19    way.

20         So I would just add that in response to both what

21    Mr. Onorato and Mr. Trusty said, as well as to allocute for the

22    sentence for this company.

23         THE COURT:  Thank you.

24    Mr. Onorato.

25         MR. ONORATO:  So, Your Honor, as Mr. Lal points out,

1    the -- the entity is defunct.  There's no current function.  I

2    would agree with Mr. Lal that the company was responsible for

3    doing the things that it did.  Similar to the point that I

4    brought up to the Court, when Square or PayPal violate the law,

5    they were held responsible as opposed to individuals, but we're

6    in a different posture.  You know, I've asked the Court to

7    consider the fact that, you know, officers of the company are

8    being prosecuted as mitigation and, you know, understand that

9    we're now talking about a defunct company.  So I'll say no

10   more.

11          THE COURT:  All right.  And, Mr. Firoz Patel, I

12   didn't know if you wanted to say anything on behalf of the

13   company that you would like for me to consider.

14          MR. FIROZ PATEL:  I think it's pretty much -- well,

15   sorry.  There's nothing really I can add more to this here.  I

16   think it's pretty clear.  It's -- we've come to a conclusion on

17   this matter as well on behalf of the company.

18          THE COURT:  All right.  So as I mentioned at the

19   outset, the plea agreements that Firoz Patel, Ferhan Patel, and

20   MH Pillars have reached with the government are the type of

21   agreement that binds the Court with respect to sentencing.

22   And, thus, the Court may accept them or not.  At the time that

23   each defendant pled guilty, the Court deferred its decision

24   whether or not to accept the agreements.  And I did so because

25   I wanted to review the presentence reports in order to have a

1    basis for evaluating the reasonableness of the binding

2    sentencing ranges.

3         I've now reviewed those reports, the submissions of

4    counsel, the exhibits provided, along with your sentencing

5    memoranda, letters from various family members and community

6    members, and let me pause to say at this point that I'm always

7    very appreciative of getting letters from people who know a

8    defendant well because they do provide important insight into

9    that person's history and characteristics.  So thank you to all

10   who have corresponded with me.

11        I have considered not only the facts and circumstances

12   of the offenses but also these defendants' history and

13   characteristics, as well as the other factors that Congress has

14   set forward in section 3553(a), and I will discuss some of my

15   considerations in this regard momentarily.  But at this point,

16   I can say that I do agree with the government and with defense

17   counsel that the proposed binding sentencing ranges, which are

18   between 20 and 52 months of imprisonment for Firoz Patel,

19   between 12 and 36 months of imprisonment for Ferhan Patel, and

20   3 years of corporate probation and criminal forfeiture of all

21   seized or restrained funds with respect to MH Pillars are

22   appropriate sentences in this case, insofar as sentences within

23   these ranges are sufficient but not greater than necessary to

24   comply with the purposes of punishment.

25        In other words, the Court finds that the binding

1    sentencing ranges are outside the applicable guideline range in

2    a manner that is justifiable given the facts and circumstances

3    in this matter in light of the purposes of punishment, and I

4    will, therefore, accept the binding plea agreements and will

5    impose a sentence consistent with the parties' binding

6    agreements.

7          As far as the corporate defendant is concerned, that

8    basically takes care of the matter of the sentence because the

9    binding agreement selects a particular probationary term and

10   certain other requirements, and the Court finds that these are

11   reasonable.

12         The individual defendants' agreements contain sentencing

13   ranges.  And so the Court must now turn to the issue of what

14   specific term of imprisonment is appropriate within the

15   prescribed range for each defendant.

16         The Court must select this term of imprisonment by

17   evaluating the relevant factors set out by Congress in

18   18 U.S.C. § 3553(a) in order to ensure that it imposes a

19   sentence sufficient but not greater than necessary to comply

20   with the purposes of sentencing.  These purposes include the

21   need for the sentence imposed to reflect the seriousness of the

22   offense, to promote respect for the law, and to provide just

23   punishment for the offense.  The sentence must also deter

24   criminal conduct, protect the public from future crimes by a

25   defendant and promote rehabilitation.

1          In addition to the guidelines and policy statements, the

2     Court must consider the nature and circumstances of the

3     offense, the history and characteristics of the defendant, the

4     types of sentences available, the need to avoid unwarranted

5     sentencing disparities among defendants with similar records

6     who have been found guilty of similar conduct, and the need to

7     provided restitution to any victims of an offense.

8          This Court has considered all of these factors when

9     determining what the appropriate sentence is in each of these

10    cases, and in accordance with my ordinary practice, I won't

11    march through in detail each of my considerations with respect

12    to the factors orally here this afternoon.

13         However, I do think it is important to say something for

14    the record and for these defendants about the nature of the

15    offenses of conviction in each defendant's history and

16    characteristics, and I'm speaking to both individual defendants

17    now because the offenses that they have committed are

18    substantially similar, although they have different levels of

19    culpability, as the differing sentencing ranges reflect.

20         With respect to the nature of the offenses at issue

21    here, the Court finds that it is undeniable that the Patel

22    brothers and their company have committed very serious crimes.

23    The probation office's recommendation describes these

24    individual defendants in a way that I find very compelling.

25    The description is, quote, the masterminds of an illegal money

1    transmitting scheme with high-risk merchants who were involved

2    in pyramid and Ponzi schemes, end quote.  And I think that this

3    characterization is exactly right.

4         The record is very clear about the unlawful conduct that

5    their business activities entailed, including proceeding to

6    operate an unlicensed -- in an unlicensed manner in at least

7    45 states and the District of Columbia; actively soliciting

8    transfer of monies and fees from known illegal enterprises,

9    such as drug dealers and fraudulent business operators; setting

10   up various entities to conceal the fact that you were accepting

11   money transfers from illegal merchants; and actively sanitizing

12   client lists and other records, you know, indicia of the

13   conduct that you were engaged in to prevent regulators and

14   others from detecting it.

15        And at the end of the day, as the very, very substantial

16   loss calculation indicates, the defendants effectively

17   laundered more than $250 million worth of illicit funds through

18   this elaborate money transfer.  Now, let me just say that

19   Mr. Trusty points out that the guidelines in this case are

20   draconian, that they're way out of whack in terms of where they

21   come out.  As we calculated them, we're talking about life

22   sentences, but that is presumably why the parties negotiated

23   sentencing ranges that are far below that.

24        Now, the Court understands that and, therefore, it

25   doesn't find the guidelines that particularly helpful, although

1    I will say that the loss amount in a money laundering scheme is

2    not just the fees that particular defendants received from

3    engaging in this conduct, but it is, in fact, calculated on the

4    amount of money that was laundered during the operation, which

5    is what happened here.

6        What I think is the most astonishing to me -- and this

7    sort of weaves its way in and out of the defendants' -- both

8    defendants' sentencing memoranda -- is the suggestion that each

9    of the defendants just got caught up in the business operations

10   and were essentially in over your heads.  It's not that I

11   necessarily think that that's wrong.  It's just strange under

12   the circumstances that are listed or laid out in the -- the

13   probation officer's report, which is what has become the basis

14   for my sentencing.

15       You were entrepreneurs.  According to, you know, page 1

16   of Mr. Firoz Patel's sentencing memoranda, you found it

17   difficult to, quote, navigate this complex space.  You did not,

18   quote, appreciate the seriousness, challenges, and perils of

19   the type of business that you were engaged in.  Well, I mean, I

20   don't know whether or not you realized the seriousness of the

21   harm that was actually being inflicted on the people whose

22   lives are effectively destroyed by the clients that you are

23   facilitating.

24       I appreciate that you were not yourselves, you know,

25   selling the drugs or defrauding individuals in the context of

1    your direct business operations, but you were facilitating that

2    conduct in a very real way.  As Mr. Lal says, these businesses

3    can't -- those kind of businesses, direct illegal businesses,

4    can't operate unless they have the ability to collect money,

5    and that was your role.

6         I don't know if you thought about how many drug addicts

7    would be created from your serving as the repository of funds

8    for the illegal steroid operation or how many older people

9    would lose their life savings and would have to forego

10   retirement because you helped schemers who were intent upon

11   defrauding them.

12        I don't often see sentencing memoranda in which a

13   defendant admits that he didn't really appreciate the

14   seriousness of his conduct, and that may well be so.  But even

15   accepting that representation, the Court finds that there's

16   simply no plausible basis for contending that either of you was

17   unaware of the challenges and perils of your chosen business

18   venture.

19        The reason why I don't accept that representation is

20   because the record demonstrates that many, many times you

21   received cease and desist letters from state regulators who

22   said please stop operating an unlicensed, you know, money

23   business in our jurisdiction.  Or you heard directly from

24   employers or auditors or people who were trying to give you

25   advice about how to operate.  You heard from them what you were

1    doing was unlawful.  And yet you persisted.

2         Now, Mr. Ferhan Patel says, well, you know, we consulted

3    with people while we were trying to come into compliance; but

4    one way to come into compliance is to stop doing what it is

5    that you were doing.  And the thing that the Court finds

6    striking about the record in this case, the conduct that you've

7    agreed to in the plea agreement and what appears in the

8    probation department, is -- is your persistence in continuing

9    to engage in behavior that you were repeatedly warned about, to

10   facilitate the kinds of transactions that you apparently

11   accepted and promoted, that you went to great lengths to

12   conceal those engagements, which indicates that you clearly

13   knew full well that what you were doing was wrong and that you

14   were willing to take the risk.

15        So the challenges and perils were not unknown.  They

16   were, in fact, clear.  You saw them, and you not only ignored

17   them, but you went out of your way to conceal the behavior and,

18   therefore, minimize the consequences.  Mr. Onorato says, well,

19   that may be so, but there are other companies that do similar

20   things and they don't get prosecuted or they don't, you know --

21   individual corporate officers aren't held to account.  I don't

22   know whether you-all factor that into your own calculus, you

23   know, what are the chances that we're going to get prosecuted,

24   what are the chances we're going to get caught.  I don't know

25   if that was something that went into your own thought

1    processes, but the Court cannot control what the government

2    seeks to prosecute.

3         The sentences that the government recommends in other

4    cases -- and it's really, really hard to compare apples to

5    apples when you try to think about what sentences, you know,

6    other similar defendants sentenced by other judges have

7    received.  I don't know the specific circumstances in those

8    cases.  So it's very hard for me to say that they received the

9    right sentence as opposed to the sentence that I might believe

10   is appropriate for the circumstances.  All I know is that when

11   one plays with fire, one eventually gets burned.  And that's

12   where we are right now, and this Court does not think that

13   either of you, frankly, had, you know, a reasonable defense

14   concerning your knowledge or culpability with respect to the

15   seriousness of these offenses.

16        I don't accept, for example, Mr. Firoz Patel, that you

17   were just overwhelmed by the rapid success of this company and

18   were too unsophisticated to fully appreciate the compliance

19   risks when people were telling you specifically what you could

20   and could not do.

21        And I'm also unmoved by the suggestion that you,

22   Mr. Ferhan Patel, were merely following your brother's orders

23   and had no independent will concerning the clearly unlawful

24   activity that formed the bulk of this business enterprise.

25   Now, I do appreciate and want to emphasize that Ferhan Patel is

1       less culpable, and perhaps maybe even substantially less, but

2       that's not to say that there's no culpability there or that

3       punishment, significant punishment, is not warranted.

4              I would ordinarily be inclined to give both of you

5       sentences at the top of the binding range given the extent and

6       nature of your fraudulent activities, but I've also taken into

7       account your individual characteristics.  And as a result, I do

8       think that a sentence at the top of the ranges that have been

9       put forward would be greater than necessary to comply with the

10      purposes of punishment.

11             In particular, neither of you have any criminal history,

12      which is a very significant factor in this Court's

13      determination of what appropriate sentences are in any given

14      case.  I also appreciate what the character letters have said

15      about each of your commitments to family, Mr. Ferhan's

16      commitment to education.  I've given a specific consideration

17      and weight to Mr. Firoz Patel's family obligations which are

18      significant given his wife's serious medical condition.  I do

19      not have any doubt about the representations that have been

20      made in the letters concerning either defendants' devotion to

21      their families, communities, and friends.  And these

22      considerations do have an impact on the Court's views regarding

23      what terms of imprisonment are sufficient but not greater than

24      necessary to promote the purposes of punishment in light of the

25      very serious criminal conduct in this case.

1          Let me say a word about the *Smith* departure.  While I

2     certainly appreciate that that is an appropriate consideration,

3     I think it's a wash in this case, primarily because the

4     government does not oppose your seeking to serve your terms of

5     imprisonment in Canada, which is where you are now.  And if you

6     manage to have that accommodation, then it doesn't matter that

7     you would have been sentenced to a, you know, significant

8     period of time without various accommodations that might be

9     afforded to other defendants in the United States.

10          If the Court knew for certain that you would not be able

11     to -- that you would have to serve your entire sentences here,

12     maybe because the government was objecting to allowing you to

13     serve your sentences elsewhere or you were in custody here

14     right now and there was no indication that you would actually

15     get back to Canada any time soon, all of those things might

16     sway the Court to discount your sentence on the basis of the

17     international aspects.  But I think under these circumstances,

18     you're in Canada.  The government doesn't object.  There's no

19     basis to believe that Canada would object to allowing you to

20     serve the sentence where you are.  I don't think that the *Smith*

21     departure really is at play in terms of the Court's own

22     considerations.

23          MR. ONORATO:  Your Honor, to interject for a second.

24     And I apologize.

25          The defendants must each commence service of their

1    sentence and serve at least half of their sentence before

2    they're eligible under the treaty to go back to Canada.  So

3    they can't serve the entirety of their sentence in Canada.  I

4    know the Court probably knows that, but I just wanted to make

5    that clear.

6              THE COURT:  Thank you, Mr. Onorato.  That was a

7    helpful clarification.

8              Let me say what I was speaking to was the concern that

9    Canada may not accept them, which was something that you

10   articulated at the beginning in light of this, and I see no

11   basis given that they already have been in Canada, that they've

12   been following, you know, directions, that nothing has

13   happened, that they don't seem to be any sort of a threat or

14   problem from the standpoint of whether or not Canada would be

15   willing to honor the treaty and allow them to come back; I

16   don't see any basis for that in the facts.

17             And so, as a result, I think that, you know, if they

18   start out at Danbury at the Court's request or whatever, that

19   there's a reasonable chance that they might be able to serve

20   out the remainder of their sentence in Canada, and, therefore,

21   I'm not going to discount it on the front end the way that

22   other courts may have in -- in -- under different

23   circumstances.

24             So all things considered, again, the Court has looked

25   through and evaluated all of the 3553(a) factors.  We've had a

1    very lengthy hearing here today that I've appreciated.   I

2    conclude that as a general matter, middle of the range

3    sentences are appropriate in this case and are sufficient but

4    are not greater than necessary to reflect the seriousness of

5    the instant offense, to promote deterrence, and to protect the

6    public from future crimes committed by these defendants.

7         I also think that Ferhan Patel's conduct and

8    circumstances warrant a penalty that is slightly less than

9    middle in the sense that it -- it should be no greater than

10   50 percent of Firoz Patel's sentence.

11        Therefore, I will impose a term of imprisonment of

12   36 months for Firoz Patel and 18 months for Ferhan Patel, as

13   well as three years of probation for MH Pillars under the

14   circumstances presented in this case.  So based on my

15   considerations and the statement that I've just made, I will

16   now state the sentence to be imposed with respect to each

17   defendant.

18        Mr. Firoz Patel, it is the judgment of the Court that

19   you are hereby committed to the custody of the Bureau of

20   Prisons for 36 months on Count 1 and 36 months on Count 4 to

21   run concurrently.

22        You are further sentenced to serve concurrent terms of

23   24 months of supervised release on Count 1 and Count 4 and to

24   pay a 2 -- excuse me -- $200 assessment.  The Court finds that

25   you do not have the ability to pay a fine and, therefore,

1    waives imposition of a fine in this case.  The special

2    assessment is immediately payable to the Clerk of the Court for

3    the U.S. District Court for the District of Columbia.  Within

4    30 days of any change of address you shall notify the Clerk of

5    the Court of that change until such time as the financial

6    obligation is paid in full.  The Court waives any interest or

7    penalties that may accrue on unpaid balances.

8         Within 72 hours from release -- of release from custody,

9    you shall report in person to the probation office in the

10   district to which you are released.  While on supervision, you

11   shall submit to the collection of DNA, you shall not possess a

12   firearm or other dangerous weapon, you shall not use or possess

13   an illegal controlled substance, you shall not commit another

14   federal, state, or local crime.  You shall also abide by the

15   general conditions of supervision adopted by the U.S. Probation

16   Office, as well as the following special conditions:

17        Employment and volunteer restrictions.  You must not

18   engage in an occupation, business, profession, or volunteer

19   activity that would require or enable you to transfer funds on

20   behalf of the public without the permission of the probation

21   office.

22        Deportation compliance.  You must immediately report to

23   the U.S. Immigration and Customs Enforcement agency and follow

24   all their instructions and reporting requirements until any

25   deportation proceedings are completed.  If you are ordered

1    deported from the United States, you must remain outside the

2    United States, unless legally authorized to reenter.  If you

3    reenter the United States, you must report to the nearest

4    probation office within 72 hours of your return.

5         The probation office shall release the presentence

6    investigation report to all appropriate agencies in order to

7    execute the sentence of the Court.  Treatment agencies shall

8    return the presentence report to the probation office among --

9    upon the defendant's completion or termination from treatment.

10        Pursuant to Rule 32.2(a) of the Federal Rules of

11   Criminal Procedure, you, Mr. Firoz Patel, are hereby ordered to

12   forfeit a money judgment in the amount of $4,620,459.45.  This

13   is the value of seized and restrained property by the

14   government.  The properties that are referenced in the final

15   consent order of forfeiture are subject to this forfeiture, an

16   amount to the figure that I have indicated.

17        Notice of appeal.  You have the right, Mr. Firoz Patel,

18   to appeal the sentence imposed by this Court under the limited

19   circumstances laid out in your plea agreement.  If you choose

20   to appeal, you must file an appeal within 14 days after the

21   Court enters judgment.  If you are unable to afford the cost of

22   an appeal, you may request permission from the Court to file an

23   appeal without cost to you.

24        All right.  Are there any objections to the sentence

25   imposed that are not already noted on the record?

1          MR. LAL:  Your Honor, no objections, but if I could

2     just get a point of clarification.  There are a series of

3     specific assets that the Court -- that the parties agreed would

4     be forfeited, and I just want to make sure that the record

5     reflects that the Court's order specifically includes the

6     specific forfeiture of all of those assets.

7          THE COURT:  Yes, I was going to read the long list,

8     and then I suddenly decided that to the extent that those

9     assets are listed in the final consent of forfeiture that we

10    would post and then will be reflected in the actual judgment

11    that the Court puts out, that that would be sufficient.

12    Although I'm happy to read them all, if that's what you would

13    like me to do, but I figure we can work that out and put it in

14    the document.

15         MR. LAL:  No, no.  I just -- that -- the Court

16    solution is perfectly acceptable.  I just wanted to make sure

17    that the record was clear on that.  Thank you.

18         THE COURT:  All right.  Anything else, Mr. Onorato?

19         MR. ONORATO:  No, Your Honor, only if the Court

20    accepts our recommendation for FCI Danbury.

21         THE COURT:  Yes, I will include that in the judgment.

22    I will also include a delay of reporting as requested.  I

23    believe you requested the end of February.

24         MR. ONORATO:  Correct, Your Honor.

25         THE COURT:  Yes, I will include that in the judgment.

1    I didn't hear Mr. Lal object.

2              MR. LAL:  Your Honor, the government does not have an

3    objection to Danbury for either defendant, and with respect to

4    Mr. Firoz Patel does not have an objection to delayed

5    surrender.  I don't know whether Mr. Trusty has any request

6    with respect to timing.

7              MR. TRUSTY:  Your Honor, if we could, we'd like to

8    mirror that with the recommendation of Danbury and the late

9    February report date or some --

10             THE COURT:  I'm happy to do so.  I have other -- a

11   little bit more in my script here relating to surrender,

12   et cetera, but I will put those requests.  It's certainly a

13   request of the Court, and I can't order Danbury, but I can

14   suggest it and I can set up the judgment so that it doesn't

15   take effect in terms of their arrival until the end of

16   February.

17             MR. ONORATO:  Thank you, Your Honor.  If I may

18   suggest an arbitrary date of February 26 just so BOP has a date

19   in mind and then --

20             THE COURT:  All right.

21             MR. ONORATO:  -- if I can impose upon the Court to

22   ask the BOP, to the extent practicable, to -- to have the men

23   serve at the same facility to make it easier on family for

24   visits and the like.

25             THE COURT:  I will put it in as --

1      THE PROBATION OFFICER:  Your Honor, this is Probation

2  Officer Sherry Baker.  I would suggest on or after

3  February 26th just in case they're not able to honor that

4  specific date.

5      THE COURT:  Thank you, Ms. Baker.  I will use that

6  exact terminology.

7      All right.  So as set forth in the plea agreement, the

8  government has pledged to move to dismiss the indictment

9  against Mr. Firoz Patel.  Does the government wish to do so

10  now?

11      MR. LAL:  Your Honor, the government does.  We would

12  ask that the indictment be dismissed with respect to

13  Firoz Patel.

14      THE COURT:  All right.  The motion is granted.  The

15  indictment with respect to Mr. Firoz Patel will be dismissed.

16      Let me now state the sentence to be imposed with respect

17  to Mr. Ferhan Patel.  It is the judgment of the Court that you,

18  Mr. Ferhan Patel, are hereby committed to the custody of the

19  Bureau of Prisons for a term of 18 months of imprisonment on

20  Count 1 with credit for time already served when you were

21  detained from April 23rd, 2018, to May 15th, 2018, on the

22  charge -- charges in this case.

23      You are further sentenced to serve a term of 12 months

24  of supervised release on Count 1 and to pay a $100 special

25  assessment.  The Court finds that you do not have the ability

1    to pay a fine and, therefore, waives imposition of a fine in

2    this case.  The special assessment is immediately payable to

3    the Clerk of the Court for the U.S. District Court for the

4    District of Columbia.  Within 30 days of any change of address,

5    you shall notify the Clerk of Court of the change until such

6    time as the financial obligation is paid in full.  The Court

7    waives any interest or penalties that may accrue on unpaid

8    balances.

9         Within 72 hours from the -- of release from custody, you

10   shall report in person to the probation office in the district

11   to which you are released.  While on supervision, you shall

12   submit to the collection of DNA, you shall not possess a

13   firearm or other dangerous weapon, you shall not use or possess

14   an illegal controlled substance, and you shall not commit

15   another federal, state, or local crime.

16        You shall also abide by the general conditions of

17   supervision adopted by the U.S. Probation Office, as well as

18   the following special conditions:

19        Employment and volunteer restrictions.  You must not

20   engage in any occupation, business, profession, or volunteer

21   activity that would require or enable you to transfer funds on

22   behalf of the public without the permission of the probation

23   office.

24        Deportation compliance.  You must immediately report to

25   the U.S. Immigration and Customs Enforcement office and follow

1     all their instructions and reporting requirements until any

2     deportation proceedings are completed.  If you are ordered

3     deported from the United States, you must remain outside the

4     United States unless legally authorized to reenter.  If you

5     reenter the United States, you must report to the nearest

6     probation office within 72 hours after your return.

7          The probation office shall release the PSR investigation

8     report to all appropriate agencies in order to execute the

9     sentence of the Court.

10          Pursuant to Rule 32.2(a) of the Federal Rules of

11     Criminal Procedure, you, Mr. Ferhan Patel, are hereby ordered

12     to forfeit a money judgment in the amount of $4,350,459.45.

13     This money judgment is the value of seized and restrained

14     property by the government -- has seized and restrained such

15     property, and the various properties that are to be forfeited

16     are listed in the final consent order of forfeiture, which is

17     being signed and executed in connection with this case.

18          Mr. Ferhan Patel, you have the right to appeal the

19     sentence imposed by this Court under the limited circumstances

20     laid out in your plea agreement.  If you choose to appeal, you

21     must file an appeal within 14 days after the Court enters

22     judgment.  If you are unable to afford the cost of an appeal,

23     you may request permission from the Court to file an appeal

24     without cost to you.

25          Let me ask about objections.  I will include all of the

1    requests in terms of placement and timing of reporting.  Are

2    there any other objections to the sentence that are not already

3    noted on the record?

4            MR. TRUSTY:  No objections, Your Honor.  One

5    clarification.  When you were describing the credits for time

6    served, I think you may have given the date from when he was

7    detained in this District, but he -- if you look at the

8    presentence report release status, they gave, like, an

9    April 23rd date.  The starting point for him was actually

10   March 18th of 2018 when he came into Detroit and was

11   incarcerated in the airport.

12           THE COURT:  I apologize.  I'll make that correction

13   in the actual judgment.  And the date is March 18th, 2018?

14           MR. TRUSTY:  March 18th.  I think you had the May

15   15th right, but you probably didn't see the initial appearance

16   date for April.

17           THE COURT:  Thank you.  Mr. Lal, do you object to

18   that, or does that comport with your understanding of the

19   defendant's detention status?

20           MR. LAL:  No, Your Honor, no objections.  That's

21   consistent with the government's recollection.

22           THE COURT:  All right.  You will get credit for that

23   time.

24       Anything else?

25           MR. TRUSTY:  No for Mr. Patel, Your Honor.  Thank

1    you.

2          MR. LAL:  Not for the government.

3          THE COURT:  Let me have the government focus on

4    whether moving to dismiss the indictment is appropriate at this

5    time.

6          MR. LAL:  Your Honor, the government would move to

7    dismiss the indictment against Ferhan Patel at this time.

8          THE COURT:  All right.  The -- your motion is

9    granted, and the indictment against Ferhan Patel is dismissed.

10   I am taking from the parties' discussions previously about

11   detention that no one objects to the voluntary surrender of

12   these defendants.  I --

13         MR. LAL:  That's correct on behalf of the government.

14         THE COURT:  All right.  Based on both defendants'

15   history of compliance with supervision, their timely appearance

16   at every scheduled court date, and the lack of any violence in

17   their histories, I conclude that Mr. Firoz Patel and Mr. Ferhan

18   Patel are unlikely to flee and pose no danger to themselves or

19   to the community.

20         Therefore, I will order that they continue to be on

21   supervision until voluntary surrender.  Each of you is hereby

22   ordered to surrender or serve your sentence as directed by the

23   probation office.  Let me caution you about your conduct while

24   you're out on supervision prior to voluntary surrender.

25         You are required to continue to follow the conditions of

1   release as they have applied to your case and as the pretrial

2   service office has directed and will continue to direct.  If

3   you violate any conditions of supervision, an arrest warrant

4   may issue, and you may be detained for failing to comply with

5   the conditions of release prior to your voluntary surrender

6   date.  More importantly, the penalties for failure to surrender

7   for service of a sentence are serious.  Such a violation is a

8   separate offense for which you could be sentenced to a fine or

9   imprisonment of up to ten years or both.

10           We have discussed the recommendations for an

11   incarceration facility.  Mr. Lal, if you could make whatever

12   corrections you need to make with respect to the final consent

13   orders and with the relevant signatures and get that to me, I

14   can get that executed.

15           MR. LAL:  I will do that, Your Honor.  I'll

16   coordinate with Mr. Onorato in terms of receiving the two

17   documents that I need from him, and then I'll get you the

18   signed copies.  If not today, then hopefully on -- tomorrow is

19   a holiday.  So hopefully on Thursday.

20           THE COURT:  All right.  Finally, we have MH Pillars.

21   Based on my consideration of the 3553(a) factors, it is the

22   judgment of the Court that MH Pillars is hereby ordered to 36

23   months of corporate probation on Count 1.  MH Pillars is

24   further sentenced to pay a $400 special assessment.  The Court

25   finds that MH Pillars does not have the ability to pay a fine

1    and, therefore, the Court waives imposition of a fine in this

2    case.  Special assessment is immediately payable to the Clerk

3    of the Court for the U.S. District Court for the District of

4    Columbia.  Within 30 days of any change of address, MH Pillars

5    must notify the Clerk of the Court of that change until such

6    time as the financial obligation is paid in full, and the Court

7    waives any interest or penalties that may accrue on unpaid

8    balances.

9        MH Pillars -- I'm hesitating because I'm trying to

10   understand whether MH Pillars is subject to a period of

11   supervision.

12       Ms. Baker, corporations can't be subjected to

13   supervision, or can they be?

14           THE PROBATION OFFICER:  Yes, they can, Your Honor.

15           THE COURT:  All right.  So it is -- in essence, it is

16   the probationary term; right?

17           THE PROBATION OFFICER:  Yes.  Yes.

18           THE COURT:  All right.  So while on probation,

19   MH Pillars shall not commit another federal, state, or local

20   crime.  It's further ordered that MH Pillars shall comply with

21   the standard conditions of organizational supervision, in

22   addition to the following special conditions:

23       MH Pillars shall continue to participate in, enhance,

24   and abide by the compliance program it has adopted insofar as

25   it is continuing to operate -- if it is continuing to operate.

1    And MH Pillars shall not operate in the United States.

2           The probation office shall release the presentence

3    report investigation to all appropriate agencies in order to

4    execute the sentence of the Court.  Pursuant to Rule 332.2(a)

5    of the Federal Rules of Criminal Procedure, MH Pillars is

6    hereby ordered to forfeit a money judgment in the amount of

7    $4,620,459.45.

8           As to Count 1 of the superseding information, Mr. --

9    Mr. Firoz Patel, you have a right on behalf of MH Pillars to

10   appeal the sentence imposed by this Court under the limited

11   circumstances laid out in the plea agreement.  If you choose to

12   appeal, you must file an appeal within 14 days after the Court

13   enters judgment.  If you're unable to afford the cost of an

14   appeal, then MH Pillars may request permission from the Court

15   to file an appeal without cost to the entity.

16          Any objections to this statement of the judgment?

17          MR. LAL:  Not on behalf of the government,

18   Your Honor.

19          MR. ONORATO:  Not on behalf of MH Pillars,

20   Your Honor.

21          THE COURT:  All right.  That concludes the Court's

22   judgment as to MH Pillars.

23          Let me ask the government about moving to dismiss the

24   indictment against the corporation.

25          MR. LAL:  Your Honor, the government so moves.

1          THE COURT:  The Court grants that motion.  The

2     indictment will be dismissed against MH Pillars.

3          All right.  At long last, I think we have reached the

4     end of these proceedings.  Is there anything that anyone else

5     wants to say for the record?

6          MR. ONORATO:  Just briefly, Your Honor.  I wanted to

7     thank the government, you know, for its consideration and its

8     reasonableness in terms of fashioning, you know, the agreement

9     for the Court to impose sentence and for the Court's

10    consideration.  We really appreciate it.

11         MR. TRUSTY:  Ditto.

12         MR. LAL:  Thank you --

13         MR. TRUSTY:  That was short.

14         MR. LAL:  Thank you.  And nothing on behalf --

15    nothing else on behalf of the government, Your Honor.  Thank

16    you very much for your time today.

17         THE COURT:  All right.  Well, the Court would like to

18    say good luck to the Ferhan and Firoz Patel brothers.  I do

19    wish you the best.  And this proceeding is now concluded.

20         (The proceedings concluded at 2:03 p.m.)

21

22

23

24

25

<u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

    I, Nancy J. Meyer, Registered Diplomate Reporter, Certified Realtime Reporter, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenograph notes and is a full, true, and complete transcript of the proceedings to the best of my ability.


                    Dated this 17th day of November, 2020.


                    /s/ Nancy J. Meyer
                    Nancy J. Meyer
                    Official Court Reporter
                    Registered Diplomate Reporter
                    Certified Realtime Reporter
                    333 Constitution Avenue Northwest, Room 6509
                    Washington, D.C. 20001